No. 23-2181

# In the United States Court of Appeals for the Third Circuit

MICHAEL RITZ and ANDREW RITZ,
*Plaintiffs-Appellants,*

v.

EQUIFAX INFORMATION SERVICES LLC, EXPERIAN INFORMATION SOLUTIONS INC., TRANSUNION LLC, and NISSAN INFINITI LT,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of New Jersey
Case No. 20-13509-GC-DEA (The Hon. Georgette Castner)

## BRIEF OF PLAINTIFFS-APPELLANTS

HANS LODGE
BERGER MONTAGUE PC
1229 Tyler Street, NE, Suite 205
Minneapolis, MN 55413
(612) 607-7794

JACOB M. POLAKOFF
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 875-3000

MATTHEW W.H. WESSLER
ROBERT D. FRIEDMAN
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

January 31, 2024                    *Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Table of citations ...................................................................................ii

Introduction ...........................................................................................1

Jurisdictional statement .........................................................................4

Statement of the issues..........................................................................4

Statement of related cases and proceedings .........................................5

Statement of the case ............................................................................5

    I.    Legal Background .................................................................5

    II.    Factual Background .............................................................10

Standard of review ............................................................................... 22

Summary of argument ......................................................................... 22

Argument............................................................................................. 26

    I.    The FCRA covers all inaccuracies, not just so-called "factual" ones. .................................................................. 26

        A.    Every tool of statutory interpretation, federal agencies' interpretation of the statute, and the case law all demonstrate that the Ritzes' claim is actionable under the FCRA. .................................................................27

        B.    The district court's reliance on outlier precedent and a flawed policy rationale does not—and cannot—justify its atextual distinction between "factual" and "legal" inaccuracies. .......................................................... 39

    II.    Even if "legal" inaccuracies are not actionable, summary judgment was still improper because NMAC's reporting contained a "factual" error. .............................................46

Conclusion............................................................................................48

i

# TABLE OF CITATIONS

## Cases

*Abramski v. United States,*
   573 U.S. 169 (2014) ............................................................. 29

*Asgrow Seed Co. v. Winterboer,*
   513 U.S. 179 (1995) ............................................................. 28

*Boggio v. USAA Federal Savings Bank,*
   696 F.3d 611 (6th Cir. 2012) ............................................. 37

*Cahlin v. General Motors Acceptance Corp.,*
   936 F.2d 1151 (11th Cir. 1991) ............................................ 6

*Carvalho v. Equifax Information Services, LLC,*
   629 F.3d 876 (9th Cir. 2010) ..................................... 38, 46

*Carvalho v. Equifax Information Services, LLC,*
   629 F.3d 876 (9th Cir. 2010) ............................................. 42

*Chiang v. Verizon New England Inc.,*
   595 F.3d 26 (1st Cir. 2010) ....................................... 39, 45

*Cortez v. Trans Union, LLC,*
   617 F.3d 688 (3d Cir. 2010) ...................................... 30, 31

*Dalton v. Capital Associated Industries, Inc.,*
   257 F.3d 409 (4th Cir. 2001) ........................................ 5, 6

*DeAndrade v. Trans Union LLC,*
   523 F.3d 61 (1st Cir. 2008) ........................................ 40, 41

*Denan v. Trans Union LLC,*
   959 F.3d 290 (7th Cir. 2020) .................................... *passim*

*Erickson v. First Advantage Background Services Corp.,*
   981 F.3d 1246 (11th Cir. 2020) ........................................... 28

*Fasold v. Justice,*
   409 F.3d 178 (3d Cir. 2005) ...................................... 22, 46

*Globe Indemnity Co. v. Cohen,*
106 F.2d 687 (3d Cir. 1939) .................................................. 23, 28

*Gorman v. Wolpoff & Abramson, LLP,*
584 F.3d 1147 (9th Cir. 2009) .............................................. 32, 37

*Grigoryan v. Experian Information Solutions, Inc.,*
84 F. Supp. 3d 1044 (C.D. Cal. 2014) .................................... 46

*Gross v. CitiMortgage, Inc.,*
33 F.4th 1246 (9th Cir. 2022) ................................ 21, 24, 36, 37

*Hinkle v. Midland Credit Management, Inc.,*
827 F.3d 1295 (11th Cir. 2016) ................................. 42, 43, 44

*Hopkins v. I.C. Systems, Inc.,*
2020 WL 2557134 (E.D. Pa. May 20, 2020) ........................ 28

*Hrebal v. Seterus, Inc.,*
598 B.R. 252 (D. Minn. 2019) ........................................... 39, 40

*Ingram v. Experian Information Solutions, Inc.,*
83 F.4th 231 (3d Cir. 2023) ................................................... 45

*Nelson v. Chase Manhattan Mortgage Corp.,*
282 F.3d 1057 (9th Cir. 2002) ......................................... 10, 44

*Norman v. Trans Union, LLC,*
479 F. Supp. 3d 98 (E.D. Pa. 2020) ...................................... 28

*O'Hanlon v. Uber Technologies, Inc.,*
990 F.3d 757 (3d Cir. 2021) .................................................. 27

*Pereira v. Sessions,*
138 S. Ct. 2105 (2018) ........................................................... 38

*Regions Bank v. Legal Outsource PA,*
936 F.3d 1184 (11th Cir. 2019) ............................................. 30

*Rotkiske v. Klemm,*
890 F.3d 422 (3d Cir. 2018) .................................................. 28

*Saunders v. Branch Banking and Trust Co. of VA*,
    526 F.3d 142 (4th Cir. 2008) ................................................................ 32, 36, 37, 42

*Secretary United States Department of Labor v. American Future Systems, Inc.*,
    873 F.3d 420 (3d Cir. 2017) ................................................................................. 36

*Sessa v. Trans Union, LLC*,
    74 F.4th 38 (2d Cir. 2023) ............................................................................ 38, 45

*SimmsParris v. Countrywide Financial Corp.*,
    652 F.3d 355 (3d Cir. 2011) ................................................................................. 10

*Wadley v. Equifax Information Services, LLC*,
    396 F. Supp. 2d 677 (E.D. Va. 2005) .................................................................. 42

*Williams v. Colonial Bank*,
    826 F. Supp. 415 (M.D. Ala. 1993) ..................................................................... 42

## Statutes

15 U.S.C. § 1681 ....................................................................................... 1, 5, 33

15 U.S.C. § 1681e ............................................................................... 6, 10, 23, 30

15 U.S.C. § 1681i ................................................................................... *passim*

15 U.S.C. § 1681s ......................................................................................... 10

15 U.S.C. §1681s-2 ................................................................................. *passim*

28 U.S.C. § 1291 ............................................................................................ 4

28 U.S.C. § 1331 ............................................................................................ 4

## Rules

Federal Rule of Civil Procedure 56 ........................................................................ 22

## Regulations

12 C.F.R. § 1022.41 .................................................................................... 24, 34

12 C.F.R. 1022.43 ...................................................................................... 24, 35

**Other Authorities**

140 Cong. Rec. S4965-02 ................................................................9

S. Rep. No. 91-517 (1969) ................................................2, 5, 33

S. Rep. No. 103–209 (1993) ...........................................7, 33, 40

## INTRODUCTION

Accurate credit reporting is critical to participation in the modern American economy. Jobs, housing, access to financial services—all can turn on the information in an individual's credit report. Precisely for this reason, Congress enacted the Fair Credit Reporting Act. The law includes several measures designed to protect consumers from the harms caused by the dissemination of inaccurate credit information. That includes a requirement that furnishers of consumer information—credit-card companies, banks, and other lenders and creditors—investigate any consumer complaints about the "accuracy" of the information they report and correct anything "inaccurate." 15 U.S.C. §1681s-2(b)(1). To incentivize furnishers to comply with that mandate and to supply a remedy for consumers when they don't, the Act provides a private right of action when a furnisher unreasonably or willfully refuses to correct inaccuracies that the consumer has identified. *Id.* §§ 1681o–n.

The experience of plaintiffs Michael and Andrew Ritz—a father and son who leased a car together—shows why the FCRA is necessary. The Ritzes returned their car at the end of their lease, but the servicer, defendant Nissan Motor Acceptance Company (NMAC), continued to assess monthly payments anyway. And, when the Ritzes didn't pay for a car they didn't have and couldn't use, NMAC told credit-reporting agencies that they owed money that was past due. It took the Ritzes over a dozen complaints and four months to finally get NMAC to stop reporting that they

1

owed money for the car they had long given up. Meanwhile, the Ritzes' credit scores plummeted, they missed out on other credit opportunities, and they had to endure the headaches and stress of trying to get things fixed.

The district court, however, held that these facts are categorically beyond the reach of the statute. To make out an FCRA claim, the court held, a plaintiff must show a "factual inaccuracy"—for instance, a scrivener's error that says the Ritzes owed $500 when the furnisher's books showed $300. But this case, in the court's view, involves only a "legal issue." Specifically, NMAC now claims a contractual right to assess a monthly penalty based on the Ritzes not making an appointment to return the car and not signing a statement reporting the car's mileage.

Putting aside that NMAC had no such right—the contract reserves the penalty of additional monthly payments for when the lessee fails to "return" and keeps "possession" of the vehicle (and does not even require the Ritzes to make an appointment at all)—the district court's distinction between "factual" and "legal" inaccuracies has no basis in the text, structure, or purpose of the FCRA. Because the statute does not define "accuracy," it must be given its ordinary meaning: freedom from mistake or error. That plain-text understanding is consistent with the statute's purpose "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517, at 1 (1969). And it maps on easily to the Ritzes' claim: NMAC's assertion that the Ritzes owed money that

was past due was either true or false, accurate or inaccurate, free from mistake or error or not.

Nonetheless, the district court erected an atextual requirement of a "factual" inaccuracy based on two principal errors. *First*, it focused not on whether there was an inaccuracy but why—was the underlying reason for the inaccuracy a "factual" bookkeeping error or a legal error in applying the terms of a contract or a statute? The FCRA's text, however, expresses no concern for the underlying reason for the inaccuracy. That's for a simple reason: If a credit report erroneously says that a payment is past due, that error negatively impacts consumers (and misleads future lenders) in the exact same way whether the underlying reason for the inaccuracy is characterized as "legal" or "factual."

*Second*, the district court relied on a policy concern that furnishers (like NMAC here) aren't "qualified" to evaluate underlying legal errors. That not only impermissibly elevates the court's preferred policy over the statute's text, but it also fails to appreciate that furnishers (as three courts of appeals have explained) are qualified and well-positioned to investigate these disputes: They are in the business of collecting debt and often draft the legal instruments that create the debt. Proving as much, NMAC specifically denied that resolving the dispute here was "beyond [its] capabilities." ECF No. 71 at 15 n.35. The district court's policy concern also ignores that the FCRA accommodates furnishers' competencies in other ways. No furnisher

can be held liable just for getting it wrong. Instead, a consumer only has a claim when the furnisher conducts an *unreasonable* investigation after the consumer identifies the inaccuracy—a standard that takes account of the furnisher's particular circumstances and qualifications.

Finally, even if the district court's atextual approach were correct, the Ritzes satisfy it. After the Ritzes complained, NMAC decided to undo the assessed penalty and concluded that the Ritzes owed no money. Yet NMAC continued to report the balance as due and owing for three more months. That is a quintessential "factual" inaccuracy.

This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291 because the district court granted NMAC's motion for summary judgment and entered a final judgment in its favor. JA16–17. The district court issued its order and entered judgment on May 30, 2023, and the plaintiff timely filed a notice of appeal on June 27, 2023. JA16–19.

## STATEMENT OF THE ISSUES

1.    The Fair Credit Reporting Act requires furnishers to investigate disputes about the "accuracy" of reported information and to correct anything "inaccurate." 15 U.S.C. § 1681s-2(b)(1). Did the district court err in interpreting these requirements to categorically exempt inaccuracies rooted in "legal disputes"?

2.    Assuming that the Fair Credit Reporting Act requires proof of a "factual" inaccuracy, did the district court err in finding no genuine issue of material fact when the record shows that NMAC continued to report that the Ritzes owed money and were past due after NMAC had decided they had no outstanding debt?

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Neither this case nor any case related has been before this Court or any tribunal.

## STATEMENT OF THE CASE

## I.    Legal Background

Congress enacted the Fair Credit Reporting Act in 1970 in response to the "vast credit reporting industry [that had] developed" in the second half of the 20th century "to supply credit information" about millions of Americans. S. Rep. No. 91-517, at 2 (1969). As Congress recognized, "[t]he banking system"—and indeed, much else in our economy—"is dependent upon fair and accurate credit reporting." 15 U.S.C. § 1681(a)(1). But, far too often, credit-reporting agencies "were reporting inaccurate information," *Dalton v. Cap. Associated Indus., Inc.*, 257 F.3d 409, 414 (4th Cir. 2001), leaving consumers vulnerable to "being unjustly damaged," S. Rep. No. 91-517, at 1 (1969).

The Act thus sought to improve how credit-reporting agencies exercise their "grave responsibilities" in handling consumer credit information. 15 U.S.C. § 1681(a)(4). To that end, it employs "a variety of measures designed to insure that

[credit-reporting] agencies report accurate information." *Dalton*, 257 F.3d at 414–15. That includes, initially, protections designed to enhance accuracy before a credit report is ever created or used. Credit-reporting agencies—companies like Equifax or Experian that compile and then sell reports on a person's credit history—must follow "reasonable procedures" that will "assure maximum possible accuracy" for the information in a credit report. 15 U.S.C. § 1681e(b).

But recognizing that these requirements would not guarantee perfect accuracy in all cases, the Act also includes a mechanism for consumers to dispute, and obtain a correction of, inaccurate credit reporting. Consumers can raise a dispute about the "accuracy" (or "completeness") of "any item of information" in a credit report with the credit-reporting agency that created the report. *Id.* § 1681i(a)(1). The agency must then "reinvestigate" the item of information at issue. *Id.* If the information is found to be "inaccurate" or "cannot be verified," it must be deleted. *Id.* § 1681i(a)(5)(A). And in cases where the agency refuses to correct it, "Congress provided a unique remedy for consumers . . . by allowing them to enclose a statement as to their version of the dispute." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 n.23 (11th Cir. 1991) (discussing 15 U.S.C. § 1681i(b)). This ensures "potential creditors have both sides of the story" so that they "can reach an independent determination of how to treat a specific, disputed account"—that is, so they can make their own assessment of what accurately reflects the consumer's creditworthiness. *Id.*

6

Over time, however, these measures proved insufficient to combat the persistence of inaccurate reporting because of a "gap in the FCRA's coverage [that] weaken[ed] the accuracy of the consumer reporting system": the lack of duties imposed directly on furnishers of information. S. Rep. No. 103–209, at 6 (1993). Furnishers, unlike credit-reporting agencies, "have direct access to the facts of a given credit transaction," *id.*, and are thus best positioned to determine the accuracy of information in a report and the "legal validity of a debt," *Denan v. Trans Union LLC*, 959 F.3d 290, 295 (7th Cir. 2020). Under the original terms of the Act, however, they had no obligations to supply accurate information or to assist in investigations of consumers' disputes.

Congress amended the Act in 1996 and then again in 2010 to close this "gap." As it had done previously for credit-reporting agencies, the amended Act imposed on furnishers both preventative and corrective duties. To keep inaccurate information out of reports in the first instance, the 1996 amendments prohibit a furnisher from supplying information that it "knows or has reasonable cause to believe . . . is inaccurate." 15 U.S.C. § 1681s-2(a)(1)(A).

And to enhance the mechanisms for correcting information that makes its way into reports anyway, those amendments also defined the role of furnishers in the "reinvestigation" process. Specifically, any time a consumer disputes the "accuracy" or "completeness" of information with a credit-reporting agency, the agency must

forward that dispute to the furnisher. 15 U.S.C. § 1681i(a)(1)-(2). Once notified, the furnisher must "(A) conduct an investigation with respect to the disputed information; (B) review all relevant information provided by the consumer reporting agency . . . ; [and] (C) report the results of the investigation to the consumer reporting agency." 15 U.S.C. § 1681s-2(b)(1). If the investigation determines that the disputed information is inaccurate, incomplete, or "cannot be verified," the furnisher must "modify," "delete," or "permanently block the reporting of that item of information." *Id.* § 1681s-2(b)(1)(E).[1]

---

[1] In full, 15 U.S.C. § 1681s-2(b)(1) provides:

> After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—
>> (A) conduct an investigation with respect to the disputed information;
>> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;
>> (C) report the results of the investigation to the consumer reporting agency;
>> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
>> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly--
>>> (i) modify that item of information;

The 2010 amendments further expanded furnishers' duties. They directed the Consumer Financial Protection Bureau, in consultation with the Federal Trade Commission and other agencies, to establish guidelines requiring furnishers to respond to disputes that consumers raise directly with the furnisher (rather than starting with the credit-reporting agency). 15 U.S.C. § 1681s-2(a)(8). The amended Act leaves the details to the agencies but sketches out the core requirement: Furnishers must investigate any time a consumer directly disputes the "accuracy" of information and then delete it if is "inaccurate" (or unverifiable). *Id.*

But although the FCRA thus includes multiple measures designed to increase accuracy and has continuously expanded protections to meet that goal, it "does not establish nor contemplate a standard of perfection." 140 Cong. Rec. S4965-02. As a result, neither a credit-reporting agency nor a furnisher can be held liable simply because a credit report contained inaccurate information. Rather, in recognition of the fact that some good-faith errors are inevitable in the processing of "millions of data entries literally every day," the Act limits liability to unreasonable processes. *Id.* Thus, a consumer may sue only if a credit-reporting agency lacked reasonable procedures to ensure "maximum possible accuracy" on the front end, 15 U.S.C. §

---

(ii) delete that item of information; or
(iii) permanently block the reporting of that item of information.

1681e(b), or if it failed to conduct a reasonable reinvestigation of a dispute, *id.* §
1681i(a)(1).

And furnishers have even more protection with respect to their statutory duty
to supply accurate information. Consumers may only sue furnishers when they fail
to conduct a reasonable investigation of a dispute first raised with a credit-reporting
agency. *Id.* § 1681s-2(c); *SimmsParris v. Countrywide Fin. Corp.*, 652 F.3d 355, 359 (3d Cir.
2011). Consumers cannot sue a furnisher for supplying inaccurate information in the
first instance or for failing to conduct a reasonable investigation of a dispute raised
directly with the furnisher. *Id.*[2] In this way, the FCRA "has been drawn with extreme
care, reflecting the tug of the competing interests of consumers, CRAs, furnishers of
credit information, and users of credit information." *Nelson v. Chase Manhattan Mortg.
Corp.*, 282 F.3d 1057, 1060 (9th Cir. 2002).

## II.    Factual Background

***The Ritzes' lease.*** In May 2017, Andrew Ritz leased a Nissan Sentra from a
dealer in Freehold, New Jersey, with his father, Michael, signing as co-lessee. JA158–
59, 261. The terms of the Ritzes' car lease are standard. They require the Ritzes to

---

[2] Although federal and state agencies do have authority to enforce furnishers'
duties to supply accurate information initially and to respond to "direct" disputes,
furnishers are still only liable for damages upon proof of a "knowing" violation or
violation of an injunction—again, mere inaccuracy is not enough. 15 U.S.C.
§ 1681s(a)(2)(A), (c).

pay nearly $600 in initial registration fees and taxes and to then make 24 monthly payments of $170.23. JA257.

The lease also sets out the requirements for ending the lease in a section titled "Vehicle Return." JA259. The Ritzes had to "return the Vehicle to a Nissan dealer or other location we specify" and "complete a statement of th[e] Vehicle's mileage at termination." *Id.* The lease then explains the consequences of keeping possession and failing to return the vehicle. "[I]f you keep possession of this Vehicle past the end of the lease term," the lease explains, "you will continue to pay the monthly payments." *Id.* And, the lease goes on, "[y]ou will pay us for any damages we suffer because you failed to return this Vehicle to a Nissan dealer or other location we specify or because you failed to return this Vehicle at the end of the lease term." *Id.* The section also defines those "damages" as "the Total Monthly Payment for each month the vehicle is not returned as required" as well as interest on any miscellaneous fees (such as for excessive wear and tear) that would be applied even with a timely return. *Id.* The section does not provide a penalty or special method for calculating damages if the Ritzes failed to complete the mileage statement. *Id.* Those damages, if any, are covered by a general default clause applicable to the entire contract. JA260 (allowing lessor to sue for "damages and to recover this Vehicle" for failure to "perform any promise under this Lease").

11

The lease also includes a separate section on "[e]xcessive [w]ear and [u]se." JA259–60. That section describes how damage to the car would be assessed and gives the dealer a right to inspect the vehicle prior to the termination of the lease upon *notice* by the dealer: "You agree that *upon notice from us* and as allowed by State law, you will make the Vehicle available to us prior to the scheduled termination of this Lease, *at a reasonable time and place to be designated by us*, so that we may inspect the Vehicle for purposes of determining excessive wear and use." JA260 (emphasis added). The section provides no set penalty or special method of calculating damages for failing to show up at an inspection. JA259–60.

**The Ritzes' performance.** The Ritzes timely made each payment required under the terms of their lease. JA262, 388, 390. Nissan-Infiniti, to whom the lease had been assigned, then agreed to extend the lease an additional three months. *Id.* The Ritzes made those payments in a timely manner, too. JA390.

On August 9, 2019, the last day of the Ritzes' three-month extension, they brought the car into the Freehold dealership to return it. JA310. To their surprise, the sales manager at the dealership refused to accept the car because the Ritzes had not made an appointment. JA162. In response, the Ritzes tried showing the manager that the lease did not require an appointment to return the vehicle. JA293. In fact, the lease extension said that the Ritzes "may return [the] vehicle any time during the extension period." JA262.

12

It made no difference. The manager did not even claim (and the record did not contain any evidence) that NMAC had provided the Ritzes with any "notice" setting an inspection at a specific time or place, as required under the lease for a pre-termination review. *See* JA260. Rather, he simply refused to accept the car and threatened to have it towed to Andrew's house if he tried to leave it. JA162. And because the manager considered Andrew "rude," he refused to provide the Ritzes with a mileage statement to sign or to otherwise inspect the car for (nonexistent) damage. JA163.

The interaction left Andrew with little choice. Driving off with the car would have breached his contract and required him to pay another month for a car he did not want and could not use,[3] and to pay interest on any fees he owed. JA183, 259. Andrew therefore left the keys on the counter, offered to sign paperwork or help with an inspection at a later date, and left. JA163, 183. The manager followed him into the parking lot and angrily declared that Andrew would "never get another car." JA293.

After leaving the dealer, Andrew contacted the lease's servicer, NMAC. He explained what had happened, and because the sales manager had refused to provide the mileage statement, Andrew also reported the mileage on the car. JA 183, 313.

---

[3] The insurance was expiring that night and Andrew had already purchased a used car in preparation for having to return the Nissan. JA73, 75.

NMAC continued to charge the Ritzes anyway. On September 20, after receiving a notice that they had been charged for both August and September, the Ritzes called to complain and were told to contact the dealership. JA316, 387. The dealership—which had also been contacted separately by NMAC about the issue—told Andrew to come in to sign the paperwork it had previously refused to provide him. He did so the same day. JA166, 315–16.

**_The Ritzes' credit disputes._** That was not the end of the Ritzes' saga. It turned out that NMAC had also been reporting to credit bureaus that Andrew and his father were thirty days past due on the (improperly assessed) August payment. JA187–88.

Both Michael and Andrew took that negative report seriously. In the 1990s, Michael was homeless, with no car and no bank account. JA310. He was able to claw his way out and worked to develop some modest financial security. _Id._ Eventually, he grew his credit score to the 700s and purchased a home. _Id._ Like his father, Andrew had worked hard to earn himself a high credit score. A work-related injury in the early 2000s left him with nerve damage in his arm that limited his employment options and made him concerned about the need to rely on credit as he got older. JA292. So he built up his credit and was able to raise his score to above 800, about as high as credit scores go. _Id._ Neither wanted to see that hard work erased.

14

So Andrew promptly contacted NMAC's Complaints Management Department on September 26 to contest the negative report. JA188. He explained what had happened and that the ordeal had already "impacted [his] credit very negatively." *Id.* After looking into the issue, NMAC's Complaints Department instructed its credit team to "remove [the] August delinquency" because the "[v]ehicle was returned on 8/9/2019 but dealer grounded late" and corrected the Ritzes' information to state "Account Balance: 0.00." JA318–19, 361; *see also* JA274–76 (supervisor in Loss Recovery Department explaining that NMAC "stopped reporting that late payment because it turned out to be true that the Ritzes returned the car on August 9th").[4] In reaching this conclusion, the Complaints Department relied on a letter from the dealership that admitted that "[t]his vehicle was dropped off to our dealership on 8.9.19." JA185. Or, as the head of Complaints later put it, they were "not making an exception for a mistake made by the Ritzes," but correcting a "mistake made by the dealer." JA204.

Yet that instruction to remove the delinquency wasn't followed. The credit team disregarded it because the dealership's letter contained a typographical error in the vehicle identification number (commonly referred to as a VIN) for the Ritzes' car, and the credit team's policy was to make a correction only with a letter from the

---

[4] Nissan uses the term "grounded" to refer to the act of formally terminating a lease. JA3.

dealership in hand. JA194, 253, 319, 326. The outstanding balance and missed payment therefore remained on the Ritzes' credit report. JA191–92, 210 (reflecting that credit report showed "balance owing"); JA320.

The Ritzes continued trying to get NMAC to fix the erroneous reporting. First, the Ritzes again raised their complaint with NMAC's complaints team on October 8. JA321. That resulted in the complaints team making a second request to remove the delinquency that the credit team again disregarded because of the same typographical error. JA192–93, 321–23. Then, after receiving an October 23 letter from the credit team claiming that the information NMAC furnished was accurate (apparently, a continued byproduct of the typo in the VIN), the Ritzes tried writing a responsive letter. JA156; *see also* JA204–07. That didn't work either: The company just replied that it had "previously investigated" and its position "remain[ed] unchanged." JA157. Next, over the following two months, the Ritzes raised a total of 14 different credit disputes with the credit-reporting agencies (Equifax, Experian, and Transunion) that had received NMAC's reports. JA320–23. Each was properly forwarded to NMAC. But despite the complaints team having determined that the delinquency should be removed, because of the typo in the VIN, the credit team persisted in telling the credit-reporting agencies that the Ritzes continued to owe a balance and were 30 days late. JA323; *see also* JA194.

Meanwhile, both Michael and Andrew's credit scores dropped. JA295, 310. Andrew's dipped lower by 100 points. JA294. They both missed out on other credit opportunities. JA296 (explaining that Andrew had to delay applying for a credit card to avoid being stuck with higher interest rates); JA311. And, because of the importance to both Michael and Andrew of maintaining a strong credit record, the negative impact of NMAC's reporting—and the difficulties they faced attempting to correct it—was particularly distressing, causing "worry, anger, anxiety, [and] utter exhaustion." JA298, 311–12.

Finally, the Ritzes made a fourth attempt: They raised their complaint directly with the Consumer Financial Protection Bureau. JA324. The CFPB then forwarded the dispute to NMAC. JA196–97.

That did the trick. The head of NMAC's complaints department, Tanya Messmer, personally stepped in to make a third request to remove the delinquency. JA324. Although the credit team tried, for a third time, to cancel the request because of the typo in the VIN, Ms. Messmer overrode the attempted cancellation and finalized the correction. *Id.* As a result, on January 6—nearly four months after the Ritzes first attempted to resolve the issue—NMAC's credit team sent each credit-reporting agency an "Automated Universal Data" form to remove the erroneous report of an outstanding balance that was past due. JA324–25.

NMAC also took the opportunity, the same day, to explain to the CFPB what had happened. JA325. The company told the federal agency that "NMAC's records show that it received a letter from Freehold Nissan [the dealership] stating that the vehicle was returned on August 9, 2019, and they were late in grounding the vehicle." JA251. The letter to the CFPB said nothing about the Ritzes violating any contractual requirements for returning their vehicle, failing to sign a mileage statement (that the dealer had refused to provide), or not scheduling an appointment. *Id.*

***This lawsuit***. In September 2020, the Ritzes filed this lawsuit against NMAC under the FCRA. JA27–29.[5] The complaint alleged that the company's months-long failure to correct its erroneous reporting after the Ritzes had disputed it resulted from an unreasonable investigation and that the company willfully violated 15 U.S.C. § 1681s-2(b). JA27.

Following discovery, NMAC moved for summary judgment on two principal grounds. First, the company claimed that its reporting that the Ritzes missed their August 2019 payment was accurate. In the company's view, the Ritzes' lease did not terminate when they returned their car because they hadn't scheduled an appointment and because they didn't sign a mileage statement. ECF No. 66-5 at 18. NMAC admitted that no "contractual provisions permitting monthly payments to

---

[5] The complaint named Nissan-Infiniti instead of NMAC, but NMAC has defended the action. JA37. The Ritzes also named Equifax, Experian, and Transunion as defendants. All three have been voluntarily dismissed. ECF 39–41.

be charged for these acts in isolation" existed. ECF No. 71 at 5. Instead, the company pointed to the provision that allowed it to assess a penalty in the amount of a monthly payment to lessees who keep "possession" and fail to "return" their cars; the company claimed that the purported appointment and mileage-form requirements were incorporated into those terms. ECF No. 71 at 5–7. But NMAC did not dispute that the Ritzes had, in fact, physically returned their car on the last day of their lease. It was therefore left to argue that the Ritzes had "failed to return the [v]ehicle" because they had somehow "kept possession of the Vehicle even if not physical possession." ECF No. 71 at 8.

Second, NMAC argued that, even if its reporting of the August delinquency was inaccurate, it wasn't actionable because it turned on a "legal question" about "the validity of the debt" rather than a "factual inaccuracy." ECF No. 66-5 at 19. The company pointed to nothing in the statute's text to justify this distinction. Nor did it explain what would qualify as a "factual inaccuracy" beyond a scrivener's error. ECF No. 66-5 at 21–22. Instead, the company claimed that because it had been able to come up with an interpretation of its contract to defend its reporting—one never articulated before litigation to either the Ritzes or the CFPB—the Ritzes' claim was categorically foreclosed under the FCRA. *Id.* at 20–22.

The Ritzes opposed, explaining that each of NMAC's arguments lacked a textual basis, one in the contract and the other in the statute. On the accuracy of

19

NMAC's reporting, as even NMAC admitted, the contract did not allow the company to charge monthly payments as a penalty for not scheduling an appointment or filling out a mileage form, particularly when it was the dealer who refused to allow the Ritzes to sign the form. ECF No. 67 at 19. And on whether NMAC could be held liable under the FCRA for its inaccuracy, the Ritzes explained that the FCRA's text and its history were incompatible with a rule that furnishers could shield themselves from liability simply by characterizing a credit dispute as a legal question—a conclusion, the Ritzes further explained, that the Fourth, Seventh, and Ninth Circuits had already reached. *Id.* at 37–40. Finally, the Ritzes argued that NMAC's continuing to report that the debt was still owed after the complaints team decided to remove the delinquency was itself inaccurate. *Id.* at 21–22, 25.

The district court accepted NMAC's argument that only so-called "factual inaccuracies" are actionable. And, the court reasoned, that meant that the Ritzes' claim failed because it "turns on interpretations of 'possession' and 'return' under the lease"; that, in the court's description, constituted an "alleged legal error" about "the legal validity" of the debt. JA11. The court therefore granted the company's motion.

Like NMAC, the district court did not analyze the statute's text to reach this conclusion. Instead, the court concluded that *Chiang v. Verizon New England Inc.*, 595 F.3d 26 (1st Cir. 2010), which held that legal inaccuracies are excluded from the

FCRA's reach, represented the "prevailing approach" of courts and briefly gestured towards the policy rationale that furnishers like NMAC are not "qualified" to resolve legal questions. JA12, 14. But even that thin rationale did not survive the rest of the court's opinion. Attempting to reconcile its decision with the Ninth Circuit's contrary one in *Gross v. CitiMortgage, Inc.,* 33 F.4th 1246, 1251 (9th Cir. 2022)—the most recent circuit decision requiring furnishers to investigate inaccuracies rooted even in legal errors—the district court offered that inaccuracies are still actionable if, as in *Gross,* a "statute has made [the furnisher's] reporting inaccurate." JA14. The court did not explain why furnishers are qualified to evaluate questions of statutory interpretation but not the interpretation of their own contracts.

The district court also held that NMAC's decision recognizing that the Ritzes did not owe money "does not change the dispute's legal nature." JA13. The court reasoned that the determination that "customer service" made when instructing that the delinquency be removed did not affect the accuracy of credit reporting that was inconsistent with that very determination. *Id.* The court thought it more important that NMAC's credit team continued to deem the reporting accurate, but it did not address that fact that the credit team's conclusion was based upon a typographical error. *Id.*

21

Because of these holdings, the court did not offer any opinion as to whether NMAC's reporting was accurate.[6]

## STANDARD OF REVIEW

This Court reviews orders granting summary judgment *de novo*, viewing the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Fasold v. Just.*, 409 F.3d 178, 180, 183 (3d Cir. 2005). Summary judgment is warranted only if the moving party can show that there is "no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## SUMMARY OF ARGUMENT

**I.** The Fair Credit Reporting Act requires furnishers to investigate disputes about the "accuracy" of the information they report and to correct anything "inaccurate." 15 U.S.C. § 1681s-2(b)(1). Without any statutory analysis, the district court concluded that a consumer is barred from bringing a claim against a furnisher if the challenged inaccuracy is rooted in a "legal dispute" rather than a "factual" error. Because the district court's interpretation of the FCRA conflicts with the statute's text, structure, and purposes, it must be reversed.

---

[6] The court also did not address two alternative grounds for summary judgment related to damages and willfulness that NMAC briefly offered in its motion.

22

**A.** Statutory analysis begins with the plain text. As this Court explained decades ago, the ordinary meaning of "accuracy" is "freedom from mistake or error." *Globe Indem. Co. v. Cohen*, 106 F.2d 687, 690 (3d Cir. 1939). Nothing in that ordinary meaning distinguishes between "legal" and "factual" accuracy. That's because those terms describe *why* information is inaccurate—the error was "legal" or "factual"—not *whether* it is inaccurate. Illustrating this, NMAC's reporting that the Ritzes owed money that was past due was either free from mistake and error or not; it's only the underlying basis for the inaccuracy that the district court viewed as involving a "legal dispute." The Ritzes' claims thus fall within the scope of the FCRA's protections.

The surrounding provisions of the FCRA confirm that it was intended to reach all inaccuracies. Furnishers must investigate "any information" that a consumer contests as inaccurate and cannot report "any information" it has reason to believe is inaccurate. 15 U.S.C. § 1681s-2(a)(1), (b)(1). Credit-reporting agencies, likewise, must investigate "any item of [disputed] information" and strive for "maximum possible accuracy." *Id.* §§ 1681e(b), 1681i(a)(1). These broad mandates cannot be reconciled with the district court's narrow rule.

The district court's rule would also scuttle the pre-litigation dispute process Congress enacted. Furnishers and credit-reporting agencies only have to investigate credit disputes that concern "accuracy." If that term does not encompass

inaccuracies rooted in legal error, then consumers are left with no recourse for fixing a broad category of false and misleading reporting. Further, Congress provided consumers with the "unique remedy" of being able to include their own version of a dispute in their credit reports when a credit-reporting agency refuses to correct it. But that, too, applies only to disputes about "accuracy" and is lost under the district court's rule.

The district court's holding is also at odds with the FCRA's purpose of reducing injuries to consumers from inaccurate reporting. The district court's reading impedes, rather than advances that aim because false reporting injures consumers (and misleads future lenders) in the exact same way regardless of whether the underlying error is "legal" or "factual."

These traditional tools of statutory interpretation find even more support in federal administrative interpretation and the case law. The federal agencies tasked with enforcing the FCRA have promulgated regulations that make clear that furnishers have a duty to investigate "liability" and contract "terms"—terms that encompass "legal" inaccuracies, as the agencies have confirmed in numerous amicus briefs. *See* 12 C.F.R. §§ 1022.41(a), 1022.43(a). As for the case law, the majority of appellate courts have concluded, as the Ninth Circuit recently put it, that the FCRA "will sometimes require furnishers to investigate, and even to highlight or resolve, questions of legal significance." *Gross*, 33 F.4th at 1253.

**B.** The district court's contrary holding ignored all this and followed the First Circuit's decision in *Chiang*, characterizing it as the "prevailing approach." But *Chiang* is an outlier that no other appellate court has followed. And its holding rests on the flawed policy concern that furnishers are not "qualified" to investigate "legal" inaccuracies. Even setting aside that the court's policy preference cannot override the text, furnishers are the ones best situated to evaluate disputes over inaccuracies, as Congress recognized when expanding the FCRA to impose duties on them. Even NMAC admits that the dispute here is not beyond its competencies.

The district court's policy focus also ignores that the FCRA accommodates furnishers' qualifications elsewhere. A consumer cannot recover damages for an inaccuracy alone, whether legal or factual. Rather, furnishers can only be held liable for unreasonable investigations—a standard that shields them from liability for not undertaking overly burdensome investigations. And if, after conducting a reasonable investigation, a furnisher genuinely cannot determine the accuracy of its reporting, then the FCRA requires it to stop reporting. 15 U.S.C. § 1681s-2(b)(1)(E). The FCRA affords furnishers substantial protections to accommodate the practical burdens they face in reporting information, but it does not permit them to report debts they lack a good-faith basis to believe actually exist.

**II.** Even if the district court's interpretation of the statute were correct, the Ritzes raised a genuine issue of material fact that NMAC's reporting did involve a

"factual" inaccuracy. After the Ritzes complained, NMAC decided to remove the delinquency and return their account to a zero balance. Nonetheless, the company still continued to tell credit-reporting agencies that the Ritzes owed money. That reporting—that a consumer owes more money than even the furnisher thinks they do—is a straightforward "factual" inaccuracy.

The district court regarded this as irrelevant because it viewed NMAC's removal of the delinquency as a matter of customer service, not a determination that its prior reporting was inaccurate. Nothing in the record supports that characterization. But more importantly, it misses the point. Whatever NMAC's motive, it still concluded that the Ritzes owed no money from that point forward. The FCRA obligated it to report that, and its failure to do so was a "factual" inaccuracy.

## ARGUMENT

### I.    The FCRA covers all inaccuracies, not just so-called "factual" ones.

The Fair Credit Reporting Act is a comprehensive statute designed to root out inaccuracies in credit reporting and provide consumers with the tools necessary to correct errors that impair their ability to participate fully in the economy. And it was enacted so that consumers did not have to experience what the Ritzes did—being forced to navigate a byzantine, months-long process to fix erroneous and harmful credit reporting. The district court's holding that their claims are nonetheless

foreclosed under the Act because NMAC's inaccurate reporting stems from a "legal" error, rather than a "factual" one, has no basis in the statute's text, structure, or purpose—and the district court did not claim otherwise. Instead, the court's holding relied on outlier case law and a policy justification that is not only insufficient to overcome the statute's text but is, in any event, flawed in its own right. This Court should reverse.[7]

### A. Every tool of statutory interpretation, federal agencies' interpretation of the statute, and the case law all demonstrate that the Ritzes' claim is actionable under the FCRA.

Taking reasonable steps to ensure "accuracy" is the central duty that the FCRA imposes on furnishers like NMAC. Once a furnisher receives notice of a dispute regarding the "accuracy" of information provided to a credit-reporting agency, it must conduct a reasonable investigation. 15 U.S.C. § 1681s-2(b)(1). And if that investigation reveals that the information is "inaccurate," the furnisher must correct it. 15 U.S.C. § 1681s-2(b)(1)(E).

The question here is what "accuracy" means. Does it cover just inaccuracies rooted in "factual" errors? Or does it require furnishers to investigate and correct

---

[7] Because the district court did not decide whether NMAC's reporting was, in fact, accurate, this Court should remand to allow it to do so in the first instance. *See, e.g.*, *O'Hanlon v. Uber Techs., Inc.*, 990 F.3d 757, 762 n.3 (3d Cir. 2021) (noting that as a "court of review, not of first view," this Court "will analyze a legal issue without the district court's having done so first only in extraordinary circumstances").

inaccuracies rooted in "legal" errors as well? Every tool for answering that question—the plain text, the statute's broader structure and purpose, expert agencies' interpretations, and the case law—points in the same direction: "accuracy" covers all false information.

**_The text._** An analysis of whether a furnisher's duty under the FCRA requires an investigation of "legal" inaccuracies "begins with the text." *Rotkiske v. Klemm*, 890 F.3d 422, 424 (3d Cir. 2018). Because "accuracy" is undefined, it must be given its "ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). And, as this Court explained long ago, the "usual and ordinary meaning" of "accuracy" is "freedom from mistake or error." *Globe*, 106 F.2d at 690; *see also Erickson v. First Advantage Background Servs. Corp.*, 981 F.3d 1246, 1251 (11th Cir. 2020) (applying the same definition when considering meaning of "accuracy" in the Fair Credit Reporting Act); *Norman v. Trans Union, LLC*, 479 F. Supp. 3d 98, 116 (E.D. Pa. 2020) (collecting various similar dictionary definitions in FCRA case).

Nothing in that ordinary meaning distinguishes between "legal" and "factual" accuracy. That's because those descriptors address not *whether* information is "free from mistake or error"—that is, whether the information is "accurate"—but *why* it may or may not be. *Cf. Hopkins v. I.C. Sys., Inc.*, 2020 WL 2557134, at *8 (E.D. Pa. May 20, 2020) (applying the legal-factual distinction because the court (erroneously) viewed the relevant "question" to be "not whether the plaintiff alleges that she does

not owe the debt, but . . . why [she] alleges that she does not owe the debt"). The statute's text, by contrast, shows no concern for the "why." It requires an investigation after the "accuracy" of a report is disputed—without limitation, 15 U.S.C § 1681s-2(b). And it requires that "inaccurate" information be corrected— again, without limitation, *id.* § 1681s-2(b)(1)(E).

This case illustrates the point. No one actually argues that NMAC's reporting—that the Ritzes owed money and were past due—was somehow incapable of being accurate or inaccurate. NMAC's lead argument in its motion for summary judgment was that the reporting was accurate. ECF No. 66-5 at 16–18. Likewise, the district court's hang-up was not that NMAC's reporting couldn't be described as accurate or inaccurate, but that the proof "turns on interpretations" of contractual terms, JA11—that is, the underlying "why." Because the statute's text does not draw any distinctions based on the underlying reason for an inaccuracy, the district court's demand that the Ritzes' show a "factual" inaccuracy—which it didn't even attempt to ground in the statute's text—was misplaced and should be reversed.

***The FCRA's structure, history, and purpose.*** The other traditional tools of statutory construction—examination of the FCRA's "context, structure, history, and purpose," *Abramski v. United States*, 573 U.S. 169, 203 (2014)—reinforce the conclusion that consumers may hold furnishers liable for failing to reasonably investigate even those inaccuracies rooted in legal errors.

**1.** The surrounding text that Congress used to describe furnishers' and credit-reporting agencies' duties confirms that there is no carve out for "legal" inaccuracies. Start with the duties imposed on furnishers, who have an obligation to ensure accuracy, first, when initially reporting information and, second, post-dissemination when a dispute is raised. At the outset, a furnisher is prohibited from supplying "any information" that it knows or has reason to believe is "inaccurate." 15 U.S.C. § 1681s-2(a)(1). After, a furnisher must investigate "any information" when its "accuracy" is contested. *Id.* § 1681s-2(b)(1). When, as here, "Congress uses the word 'any' without 'language limiting the breadth of that word, "any" means all.'" *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1194 (11th Cir. 2019). So Congress could hardly have been clearer about the breadth of this obligation. The statute not only demands furnishers ensure "accuracy" without any textual limitation, but also links that obligation to "*any* information," a descriptor that precludes a limitation based on whether an error in reporting is "legal" or "factual" in nature.

Credit-reporting agencies, too, have a broad duty to ensure accuracy. Before disseminating a report, they must adopt reasonable procedures to ensure "maximum possible accuracy." 15 U.S.C. § 1681e(b). As this Court has previously explained, "the distinction between 'accuracy' and 'maximum possible accuracy' is . . . quite dramatic." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 709 (3d Cir. 2010). It means that even information that is "undoubtedly true" as a technical manner (for example, a

report that a consumer is "'involved' in a credit card scam") is nevertheless "inaccurate" under the statute if misleading (to continue the example, if the "involvement" was as a victim of the scam). *Id.* And after a report is created, credit-reporting agencies, like furnishers, must investigate "any item of information" that the consumer challenges as inaccurate. 15 U.S.C. § 1681i(a)(1)(A). Here, too, the surrounding statutory terms ("maximum possible" and "any item") confirm that the Act was intended to be as broad as possible, not to contain tacit exclusions.

**2.** A distinction between inaccuracies that are "legal" and "factual" would also disrupt the careful system for disputing inaccuracies without resort to litigation that Congress designed. Neither a credit-reporting agency nor a furnisher has an obligation to investigate information in a credit report unless a consumer first contests its "accuracy" (or "completeness"). *Id.* §§ 1681i(a)(1)(A), 1681s-2(a)(8). But if "accuracy" does not cover so-called "legal" inaccuracies, then credit-reporting agencies and furnishers could decline to conduct any investigation at all—completely eliminating the consumer's avenue for recourse. Indeed, there would be nothing to stop a furnisher from intentionally reporting false information that rests on a flawed "legal" basis because the prohibition on furnishing "inaccurate" information would not extend to that reporting. *Id.* § 1681s-2(a)(1).

There would also be no way for consumers to ensure that their disputes are reflected in their credit reports. The FCRA includes two mechanisms for getting

disputes into credit reports. First, once a consumer disputes the "accuracy" of reported information directly with a furnisher, the furnisher must convey "that such information is disputed by the consumer" if it continues to report the debt. *Id.* § 1681s-2(a)(3). Second, when consumers contest the "accuracy" with a credit-reporting agency, then, if the resulting reinvestigation "does not resolve the dispute," the consumer can take advantage of the "unique remedy" that Congress provided: the right to include their own statement of why a report is inaccurate. *Id.* § 1681i(a)(1), (b). But both corrective mechanisms are lost for consumers like the Ritzes if "accuracy" excludes so-called legal inaccuracies.

And that's important because, as Congress clearly understood, context can be critical when evaluating entries on a credit report. When a consumer's credit report reveals a legitimate dispute, that "does not reflect financial irresponsibility." *Saunders v. Branch Banking and Tr. Co. of VA*, 526 F.3d 142, 150 (4th Cir. 2008). This case again shows why. A lender is quite unlikely to view people who just miss payments for no reason in the same way as people, like the Ritzes, who satisfy the terms of their contractual requirements but simply refuse to pay an extra-contractual and unilaterally imposed fee. *See also, e.g.*, *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009) (holding that the plaintiff had a valid FCRA claim where furnisher failed to disclose that debt for TV purchase was disputed because the TV delivered was defective). In fact, even NMAC recognizes the importance of context:

32

In its letter to the Ritzes refusing to correct its reporting, NMAC suggested they exercise their right to add a statement about the dispute on the credit report, JA156—a right that the district court's holding, at NMAC's urging, eliminates.

**3.** Applying a plain text interpretation of "accuracy" also aligns with the FCRA's purpose. Congress enacted the statute because of the importance of "accurate credit reporting" to the economy and to increase "fairness" to consumers harmed by false reports with little or no means for recourse. 15 U.S.C. § 1681; S. Rep. No. 91–517 (1969). And Congress expanded the statute to impose duties on furnishers to specifically to close "gap[s] in the FCRA's coverage" that allowed inaccuracies to persist and frustrated consumers' ability to resolve disputes. S. Rep. No. 103–209, at 6 (1993).

Reading the statute to cover all inaccuracies advances each of these aims. The harmful information—here, that the Ritzes owed money that was thirty days past due—looks the same to the next creditor or employer regardless of the underlying (and, on the credit report, unstated) reason for its falsity. It thus injures people like the Ritzes in precisely the same way as "factually" inaccurate reporting and, as the Ritzes' experience shows, makes the availability of reasonable means to correct the information just as critical. Likewise, "legal" inaccuracies do just as much damage to the efficient operation of the credit market: Just like "factual" errors, "legal" ones have the potential to wrongly deter lenders from contracting with people who are,

in reality, creditworthy and financially responsible. The Act should be read in a straightforward manner to limit these harms, not—as the district court's holding would have it—contorted to enable them to persist.

That does not mean, of course, that a furnisher can be held liable simply upon proof of an inaccuracy. As noted above and discussed more below, the FCRA balances furnishers' interests by requiring a consumer to prove that it conducted an unreasonable investigation—a test that accounts for any theoretical challenges a furnisher may face in responding to a dispute rooted in legal error—before the consumer can recover damages. *See infra* at 42–43. But that case-by-case accommodation, unlike the district court's rule, does not provide a categorical immunity that undermines the FCRA's purposes both in litigation and in the mandatory pre-litigation dispute process that Congress carefully designed.

***Administrative interpretation.*** Reading "accuracy" to cover all inaccuracies finds further support in two of the regulations crafted by the Consumer Financial Protection Bureau, in consultation with the Federal Trade Commission— the two agencies charged with enforcing the FCRA. *See* 15 U.S.C. § 1681s-2(a)(8)(A). The first of those regulations defines "accuracy" to require that information, among other things, "correctly[] (1) [r]eflects the terms of and liability for the account . . . [and] ; (2) [r]eflects the consumer's performance and other conduct." 12 C.F.R. § 1022.41(a). The other regulation provides that a furnisher must investigate any

dispute that, among other things, relates to a "consumer's liability for a credit account" or the "terms of a credit account." *Id.* § 1022.43(a). By requiring furnishers to correctly report and to investigate "liability" and contract "terms," these regulations necessarily contemplate that furnishers will assess "legal" disputes.

Indeed, the agencies have repeatedly confirmed that these regulations are designed to capture all inaccuracies in multiple amicus briefs urging courts to reject the factual-legal distinction that the district court applied below. As those briefs explain, the agencies' experience shows that "the accuracy and completeness of information in consumer files often turns on legal issues, such as whether a debt is valid and whom it obligates." CFPB Amicus Br. 16, *Milgram v. JPMorgan Chase Bank, N.A.*, No. 22-10250 (11th Cir. April 7, 2022); *see also, e.g.*, CFPB Amicus Br. 16–23, *Holden v. Holiday Inn Club Vacations Inc.*, No. 22-11014 (11th Cir. Dec. 16, 2022); CFPB Amicus Br. 11–22, *Sessa v. Trans Union, LLC*, No. 22-87 (2d Cir. May 5, 2022); CFPB Amicus Br. 9–16, *Gross v. CitiMortgage, Inc.*, No. 20-17160 (9th Cir. April 19, 2021). And, the agencies explained, the factual-legal distinction invoked by the district court "would be hard to implement and would undermine the purposes of the FCRA," because issues can often be "characterized as either factual or legal or both." CFPB Amicus Br. 12, 22, *Milgram v. JPMorgan Chase Bank, N.A.*, No. 22-10250 (11th Cir. April 7, 2022). So, because nothing in the FCRA "suggests that Congress intended to exclude disputes that

implicate legal issues," the agencies have urged courts to avoid these problems by rejecting the district court's interpretation of the statute. *Id.* at 16.

The agencies' interpretation confirms what the text makes clear: the FCRA covers inaccuracies whether the falsehood is rooted in a legal or factual error. But to the extent there is any ambiguity, in light of the agencies' "specialized experience" administering and enforcing the FCRA, their reasonable interpretation merits "deference." *Sec'y U.S. Dep't of Lab. v. Am. Future Sys., Inc.*, 873 F.3d 420, 427 (3d Cir. 2017).

***The case law.*** Finally, the majority of courts of appeals to address the issue have concluded that furnishers have a duty to investigate and take action based on so-called "legal" inaccuracies. *See Gross*, 33 F.4th at 1253; *Denan*, 959 F.3d at 295; *Saunders*, 526 F.3d at 149. Most recently, the Ninth Circuit held that the FCRA "will sometimes require furnishers to investigate, and even to highlight or resolve, questions of legal significance" because the statute "does not categorically exempt legal issues." *Gross*, 33 F.4th at 1253. The court explained that a contrary result—that is, "a distinction between 'legal' and 'factual' issues"—would be "ambiguous, potentially unworkable, and could invite furnishers to evade their investigation obligation by construing the relevant dispute as a 'legal' one." *Id.* Thus, the court held that a consumer could pursue a claim against a furnisher for inaccurately reporting that he owed money on a mortgage that a statute, as interpreted by the

Arizona Supreme Court, had invalidated—that is, an inaccuracy rooted in a "legal" error. *Id.*; *see also Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 618 (6th Cir. 2012) (reversing district court judgment accepting furnisher's argument that its reporting was accurate because the plaintiff had "ratified" the debt at issue).

The Fourth Circuit has also held that furnishers must investigate and report legal disputes. *See Saunders*, 526 F.3d at 149. In *Saunders*, a consumer's bank repeatedly told him that he did not owe any money on a car loan, only to then turn around and report the loan as delinquent and assess late penalties. *Id.* at 145–46. After the consumer disputed the report, the lender refused to correct it or even report it as disputed, claiming that "furnishers need not report affirmative defenses." *Id.* at 149. The Fourth Circuit disagreed, explaining that the failure to report the dispute—a quintessential "legal" one about the right to assess the late fees—left the furnished information "incomplete or inaccurate" under the "statutory text." *Id.* at 149–50. And, the court added, the furnisher's preferred rule "would be ill-advised" because, "if a consumer has a meritorious dispute," then the existence of a debt does not necessarily call into question his creditworthiness. *Id.* at 150; *see also Gorman*, 584 F.3d at 1163 (agreeing that furnishers must report "bona fide" legal disputes and reversing on that basis).

And as the Seventh Circuit has explained, it "makes sense" that furnishers must investigate and correct legal inaccuracies. *Denan*, 959 F.3d at 295 (holding that,

although credit-reporting agencies need not investigate legal disputes, furnishers must).[8] "Furnishers assume[] the risk and bear the loss of unpaid debt," so they are in the best "position to determine the legal validity of a debt." *Id.*

***The bottom line***. The FCRA does not immunize furnishers, like NMAC here, from liability for reporting inaccurate information so long as it is not "factually" inaccurate. "[T]he plain text, the statutory context, and common sense all lead inescapably and unambiguously to that conclusion," *Pereira v. Sessions*, 138 S. Ct. 2105, 2110 (2018)—as the case law shows. Because the district court required the plaintiffs to make a threshold "factual inaccuracy" showing that cannot be reconciled with any of this, its summary-judgment order should be reversed.

---

[8] Other courts, like *Denan*, have distinguished between furnishers and credit-reporting agencies when deciding whether the FCRA encompasses "legal" inaccuracies. *See Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir. 2010) (noting that "[a furnisher] stands in a far better position to make a thorough investigation of a disputed debt than the CRA does on reinvestigation"). *But see Sessa v. Trans Union, LLC*, 74 F.4th 38, 43 (2d Cir. 2023) (rejecting factual-legal distinction in case against credit-reporting agency). This distinction is also not based in the statute's text, and the relative competencies of different entities to investigate disputes, as discussed below, is properly addressed in evaluating what a reasonable investigation requires. *Infra* at 42–43. But this Court also need not resolve how the law applies to credit-reporting agencies, as the question is not presented here.

**B.    The district court's reliance on outlier precedent and a flawed policy rationale does not—and cannot—justify its atextual distinction between "factual" and "legal" inaccuracies.**

The district court did not offer a textual basis for its holding that the FCRA categorically excludes claims based on "legal" inaccuracies. Nor did the court assess the statute's structure, history, or purpose. Instead, it relied on *Chiang v. Verizon New England Inc.*, 595 F.3d 26 (1st Cir. 2010), describing that decision as "the prevailing approach" in the case law, and adopted *Chiang*'s assertion, made without analysis, that furnishers are categorically "[un]qualified" to investigate inaccuracies rooted in legal errors. JA12, 14. The district court's reliance on *Chiang* was flawed for multiple reasons: It's an outlier that disregards the text in favor of a flawed policy rationale; it creates a categorical bar based on a misplaced concern about furnishers' competencies to resolve disputes; and it highlights, as the Ninth Circuit observed, that the factual-legal distinction is unworkable.

**a.** As just recounted, *Chiang*'s holding is far from the "prevailing approach." Indeed, "no other circuit court has followed *Chiang*'s lead." *Hrebal v. Seterus, Inc.*, 598 B.R. 252, 270 (D. Minn.), *on reconsideration sub nom. Hrebal v. Nationstar Mortg. LLC*, 385 F. Supp. 3d 849 (D. Minn. 2019) (citing *Gorman* and *Saunders*).

For good reason. In erecting a threshold requirement that a consumer prove an inaccuracy rooted in a "factual" error, *Chiang*, like the district court, did not analyze the text, structure, history, or purpose of the FCRA. Instead, it borrowed

the requirement from a case addressing credit-reporting agencies' obligations under the FCRA. *See Chiang*, 595 F.3d at 38 (citing *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 67 (1st Cir. 2008)). "Like CRAs," *Chiang* reasoned, "furnishers are neither qualified nor obligated to resolve matters that turn on questions that can only be resolved by a court of law." *Id.*

*Chiang*'s one-sentence justification—which is all that the district court offered, too, *see* JA12—is wrong for multiple reasons. To start, it ignores the text of the statute, which, as explained, contains no limitation on the types of inaccuracies covered. It is for Congress, not courts, to decide whether furnishers are capable of investigating and correcting inaccuracies rooted in legal error.

But even taking the policy-driven result on its own terms, *Chiang* rests on a false equivalency between credit-reporting agencies and furnishers. "[E]ach of the nationwide consumer reporting agencies receive information from furnishers on over 1.3 billion consumer credit accounts or trade lines on a monthly basis." *Denan*, 959 F.3d at 294. They are not experts in any of the underlying contracts, and do not even have access to them until the consumer provides a copy in connection with a dispute. By contrast, as Congress recognized when amending the FCRA to extend it to furnishers, they are "best situated to determine whether the information [they] reported was inaccurate." S. Rep. No. 103–209, at 6 (1993). Furnishers are often the ones who drafted the contract in the first instance and are in the business of collecting

40

debts, which includes assessing whether there is a basis to seek enforcement of a debt under state law. And, unless a furnisher has a habit of demanding money without first ensuring it has a good-faith basis to do so, then the furnisher already evaluates consumers' disputes—whether legal or factual—apart from any duty imposed by the FCRA.

In fact, the district court itself recognized that furnishers are sometimes capable of evaluating inaccuracies rooted in legal errors. The court distinguished the Ninth Circuit's decision in *Gross* on the ground that "a statute had abolished [the] plaintiff's obligation to repay the debt." JA14. But the effect of a statute on an allegedly owed debt is just as much a "legal" issue as the effect of a contract's terms. There is no valid basis (let alone one grounded in the text) for deeming furnishers capable of doing statutory interpretation, but categorically unqualified to interpreting their own contracts.

The comparison to credit-reporting agencies is flawed for a second reason. The courts that have accepted (incorrectly) the argument in cases against credit-reporting agencies that "legal" inaccuracies are categorically not actionable have justified the distinction not just on the credit-reporting agency's purported lack of qualifications, but also on the notion that requiring them to investigate a legal dispute would countenance "an impermissible collateral attack against a lender [through] an FCRA claim against a consumer reporting agency." *DeAndrade*, 523 F.3d at 68; *see also,*

*e.g.*, *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 891 (9th Cir. 2010).[9] But "claims against furnishers . . . do not raise this consideration because the furnisher *is* the creditor on the underlying debt." *Saunders*, 526 F.3d at 150. Thus, although the policy concern cannot alter the text, the "attack" here is direct, not collateral.

**b.** *Chiang*'s focus on the qualifications of furnishers (and, for that matter, *DeAndrade*'s focus on the qualifications of credit-reporting agencies) also overlooks how the structure of the FCRA accommodates for competency elsewhere. First, as explained above, the FCRA does not demand perfect accuracy, and no furnisher can be held liable for inaccurate reporting alone. *See supra* at 9–10. The consumer, instead, must also show that the defendant failed to perform a reasonable investigation that would have uncovered the accuracy. And "what constitutes a 'reasonable investigation' will vary depending on the circumstances of the case." *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1302–03 (11th Cir. 2016). "Whether a furnisher's investigation is reasonable will depend in part on the status of the furnisher—as an original creditor, a collection agency collecting on behalf of the original creditor, a

---

[9] That rationale, it's worth noting, makes little sense. An FCRA claim based on a so-called "factual" inaccuracy—for instance, because the account belongs to someone other than person being billed or because the furnisher failed to credit a payment—is just as much a collateral attack as one based on a legal dispute. Notably, in this regard, the Fourth Circuit in *Saunders* disapproved of the two cases on which *DeAndrade* relied for that proposition. *See Saunders*, 526 F.3d at 150 (rejecting *Wadley v. Equifax Info. Servs., LLC*, 396 F. Supp. 2d 677 (E.D. Va. 2005), and *Williams v. Colonial Bank*, 826 F. Supp. 415 (M.D. Ala. 1993), as "plainly inconsistent with the statutory text").

debt buyer, or a down-the-line buyer—and on the quality of documentation available to the furnisher." *Id.* at 1302. Thus, to the extent (unlike here) a consumer raises an intricate or novel legal argument that can only be understood after an unduly burdensome investigation, then the furnisher cannot be held liable because it will not have failed to perform a *reasonable* investigation.

Of course, NMAC did not move for summary judgment on the ground that an investigation here would be too burdensome. And it's not hard to see why: Its complaints department *did* conduct a routine investigation and, because of it, identified the inaccuracy. *See also* ECF No. 71 at 15 n.35 (NMAC rejecting the idea that "the dispute is too complicated and beyond [its] capabilities").

Second, the FCRA specifically contemplates what a furnisher must do if it genuinely cannot resolve the accuracy of particular item after conducting a reasonable investigation. If a furnisher is truly so unqualified that, in response to a dispute, it cannot determine whether its own demand for money is legitimate—that is, if it really is in the habit of sending invoices without ensuring it has a sufficient good-faith basis for doing so—the furnisher must stop reporting the debt. The FCRA requires a furnisher to delete information that it has previously reported not only when that information is "inaccurate" but also when it "cannot be verified." 15 U.S.C. § 1681s-2(b)(1)(E). Verification, to be clear, does not mandate 100 percent certainty. It simply requires that the furnisher "acquire[] sufficient evidence to

support the conclusion that the information was true." *Hinkle*, 827 F.3d at 1303. But if the furnisher cannot meet even that minimum, it cannot continue to issue harmful reports that a person is failing to pay a debt.

In this way, the FCRA errs on the side of consumers. The point of the FCRA is to reduce inaccurate reporting, so it is sensible that it would prohibit the reporting of information when the furnisher does not even have a reasonable basis to believe it to be true. Especially since that doesn't leave the furnisher without recourse. It can continue to try to collect the debt through invoices and other lawful collection methods, or even sue to enforce it. But with the passage of the FCRA's 1996 amendments, what it cannot do is leverage the harmful effects of negative credit reporting to "incentivize the repayment of debts" that it lacks a legitimate basis to believe exists. *Denan*, 959 F.3d at 294.

These two separate statutory requirements—that a furnisher can only be liable if it fails to perform a reasonable investigation and that a furnisher cannot report unverified information—together address how to handle the qualifications and competencies of furnishers and require that it be done on a case-by-case, fact-specific basis. And that illustrates, as the Ninth Circuit put it, how the FCRA "has been drawn with extreme care" to reflect "the competing interests of consumers [and] furnishers." *Nelson*, 282 F.3d at 1060. "It is not for a court to remake the balance struck by Congress," *id.*, by shoehorning, as the district court did, concerns about

44

qualifications into the term "accuracy" and immunizing furnishers from an entire category of claims. *Cf. Ingram v. Experian Info. Sols., Inc.*, 83 F.4th 231, 234–35 (3d Cir. 2023) (refusing to read into the FCRA a right of furnishers to screen out frivolous disputes forwarded by credit-reporting agencies because the "plain text" committed that screening responsibility to the agencies alone).

**c.** Finally, *Chiang* shows why the Ninth Circuit concluded that a legal-factual distinction is unworkable and would lead to creditors seeking to evade their responsibilities by casting routine disputes as "legal" ones. The consumer there alleged, among other errors, that Verizon had charged him for "long distance service on one line that he sa[id] he had not ordered" and "fail[ed] to credit him for payments he had made on his account." *Chiang*, 595 F.3d at 31. Those are just as easily characterized as "factual" disputes, not "legal" ones. Yet the entire case was dismissed as involving inaccuracies grounded in legal errors. On *this* point, *Chiang* is not an outlier. *See also, e.g.*, *Sessa*, 74 F.4th at 43 (rejecting the legal-factual distinction and reversing district court order that characterized as a "legal" inaccuracy a report that the plaintiff missed a $19,444 balloon payment that was not a part of the contract).

Simply put, the district court's decision lacks any meaningful support. It has no connection to the statute's text, the underlying policy concerns cannot withstand scrutiny, and it breeds confusion. It should be reversed.

## II. Even if "legal" inaccuracies are not actionable, summary judgment was still improper because NMAC's reporting contained a "factual" error.

This Court should also reverse because the district court did not even follow its own rule. Even courts that recognize the "factual"-"legal" distinction agree that it is a straightforward "factual" inaccuracy for a furnisher to report that a consumer owes money when even the furnisher agrees that no (or less) money is owed. *See, e.g.*, *Carvalho*, 629 F.3d at 891 (contrasting "legal" inaccuracies, on the one hand, with "factual" disputes over whether the "amount past due is too high or low," on the other); *Denan*, 959 F.3d at 293 (contrasting claims over "legally inaccurate" reporting with claims about "the debt amounts or [the credit-reporting agency's] account of [the consumer's] payment history"); *Grigoryan v. Experian Info. Sols., Inc.*, 84 F. Supp. 3d 1044, 1066 (C.D. Cal. 2014) (collecting cases holding that disputes over the amount owed are actionable).

The Ritzes raised a genuine factual dispute that NMAC's reporting presents exactly this type of error, and summary judgment was therefore improper. *See Fasold*, 409 F.3d at 183, 185. After the Ritzes disputed NMAC's credit reporting, the company determined that the money was not owed. JA204, 274–76, 319. That's why it instructed its credit team to remove the delinquency. *Id.* But the company nonetheless continued to report the money as currently owed—exactly the type of "factual inaccuracy" the district court held was needed. No more is needed to reverse.

The district court, however, deemed this all irrelevant. Apparently accepting NMAC's characterization that what happened was no different than "a bank agreeing to waive a late charge," ECF No. 71 at 7, the district court concluded that "whether customer service chooses to resolve issues favorably to a consumer does not address whether the information was inaccurate." JA14. In the court's view, all that mattered was that, even after the complaints department decided to remove the delinquency, NMAC's credit team still characterized the reporting as accurate. JA13.

The district court fundamentally misunderstood the record. There is clear record evidence that the complaints department removed the delinquency because it concluded it was false, not to appease its customers. As the head of complaints testified, the company was "not making an exception for a mistake made by the Ritzes," but correcting a "mistake made by the dealer." JA204; *see also* JA274–76 (supervisor in Loss Recovery Department testifying that "it turned out to be true that the Ritzes returned the car on August 9th"). Indeed, that's what NMAC told the CFPB. JA251.

Nothing in NMAC's separate statements that the reporting remained accurate, on which the district court focused, undermines that. The record evidence shows that those contrary statements merely reflected that a typographical error introduced by the dealership prevented the credit team from updating its records. *See supra* at 15–16; JA204–07, 319, 322. As the head of complaints demonstrated by

47

ultimately overriding the credit team's continued effort to disregard the instruction to remove the delinquency, it was the complaints department's determination that controlled.

More fundamentally, the reason why NMAC changed its determination of what the Ritzes owed doesn't matter. Even if NMAC were correct that removing the delinquency was a matter of customer relations, the "factual" inaccuracy remains. NMAC's own analogy shows why. When a bank waives a late charge, the money is no longer owed. Reporting that the bank's customer *still* owes a debt and is not paying it after the bank waived it—not merely that they had failed to pay it in the past—is "factually" inaccurate. Even under NMAC's mischaracterization of the record, what happened here is no different.

Thus, evidence of NMAC's continued reporting of an ongoing debt raises a genuine issue of material fact that requires reversal even if this Court accepts the district court's threshold requirement of a "factual" inaccuracy.

## CONCLUSION

For the foregoing reasons, this Court should reverse.

Respectfully submitted,

*/s/ Robert D. Friedman*
MATTHEW W.H. WESSLER
ROBERT D. FRIEDMAN
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North

Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

HANS LODGE
BERGER MONTAGUE PC
1229 Tyler Street, NE, Suite 205
Minneapolis, MN 55413
(612) 607-7794

JACOB M. POLAKOFF
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 875-3000

January 31, 2024                    *Counsel for Plaintiffs-Appellants*

## COMBINED CERTIFICATIONS

1. This brief complies with Local Rule 46.1(e) because Matthew Wessler, counsel for the appellants, is a member of the bar of this court.

2. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 11,718 excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

3. I certify that on January 31, 2024, I filed this corrected opening brief electronically via this Court's CM/ECF system. All participants in this appeal are registered CM/ECF users and will be served by the CM/ECF system.

4. The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

5. This document was scanned for viruses using This document was scanned for viruses using VirusTotal API version 3 and no virus was detected.

January 31, 2024                    */s/ Robert D. Friedman*
                                   Robert D. Friedman