No. 23-2181

# In the United States Court of Appeals for the Third Circuit

MICHAEL RITZ AND ANDREW RITZ,
*Plaintiff-Appellants,*

v.

EQUIFAX INFORMATION SERVICES LLC, EXPERIAN INFORMATION SOLUTIONS INC., TRANSUNION LLC, AND NISSAN INFINITI LT,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of New Jersey
Honorable Georgette Castner, District Judge
Case No. 3:20-cv-13509-GC-DEA

## BRIEF OF APPELLEE NISSAN MOTOR ACCEPTANCE COMPANY LLC

Matthew A. Fitzgerald
Heidi E. Siegmund
MCGUIREWOODS LLP
800 East Canal St.
Richmond, VA 23219
(804) 775-4716
*mfitzgerald@mcguirewoods.com*

*Counsel for Defendant-Appellee
Nissan Motor Acceptance
Company LLC*

Jarrod D. Shaw
MCGUIREWOODS LLP
260 Forbes Ave., Suite 1800
Pittsburgh, PA 15222

Grace Greene Simmons*
MCGUIREWOODS LLP
888 16th St. NW
Washington, D.C. 20006

*Admitted in Pennsylvania. Application
for admission to the DC bar filed. Working
under the direct supervision of an
enrolled, active member of the DC bar.*

## CORPORATE DISCLOSURE STATEMENT

Nissan Motor Acceptance Company LLC is a subsidiary of Nissan Motor Co., LTD. Nissan North America, Inc. is a wholly owned subsidiary of Nissan Motor Co., LTD and holds 10% or more of Nissan Motor Acceptance Company's stock. Renault S.A. holds more than 10% of Nissan Motor Co., LTD's stock. Nissan Motor Acceptance Company is not aware of any other publicly held corporation that has a financial interest in the outcome of this proceeding.

Dated: April 1, 2024                    _/s/ Matthew A. Fitzgerald_
                                        Matthew A. Fitzgerald

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE............................................................................1

STATEMENT OF ISSUES ...........................................................................3

STATEMENT OF RELATED CASES AND PROCEEDINGS .........................4

STATEMENT OF THE CASE ......................................................................4

A.    The Fair Credit Reporting Act ........................................................4

B.    The Lease...........................................................................................7

C.    The Credit Dispute ........................................................................10

D.    This Suit .........................................................................................12

STANDARD OF REVIEW ........................................................................14

SUMMARY OF ARGUMENT ...................................................................14

ARGUMENT ..........................................................................................15

I.    The District Court properly granted summary judgment because NMAC was not required to investigate a nuanced contract dispute about the validity of the Ritzes' debt. .......................15

     A.    Under FCRA, furnishers need investigate only objectively and readily verifiable information. ...........................16

         1.    The ordinary meaning of "accuracy" refers to objectively and readily verifiable information. ................16

         2.    Structure and design confirm that accuracy refers to objectively and readily verifiable information. ............19

         3.    The weight of the precedent indicates that furnishers are required to investigate only objectively and readily verifiable information. ...............26

         4.    The CFPB's regulations do not require furnishers to investigate legal disputes.............................................32

         5.    A furnisher's duty to investigate legal disputes should not be left to a jury. .............................................33

     B.    The Ritzes dispute information that is not objectively and readily verifiable....................................................36

II.    NMAC properly reported the Ritzes' obligations. ..............................39

A. NMAC properly concluded that the Ritzes owed an additional month's payment for failing to follow proper procedure and for retaining constructive possession of the car. ..................................................................... 40

B. NMAC did not determine that the debt was invalid and yet continue to report it. ............................................................ 43

CONCLUSION .................................................................................. 46

CERTIFICATE OF COMPLIANCE .................................................... 47

CERTIFICATE OF SERVICE ............................................................. 48

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Appalachian States Low-Level Radioactive Waste Comm'n v. Pena,*
126 F.3d 193 (3d Cir. 1997) .......................................................... 33

*Cahlin v. Gen. Motors Acceptance Corp.,*
936 F.2d 1151 (11th Cir. 1991), *abrogated in irrelevant part by Santos v. Healthcare Revenue Recovery Grp.,* 90 F.4th 1144 (11th Cir. 2024) ............................................................... 24

*Carvalho v. Equifax Info. Servs.,*
629 F.3d 876 (9th Cir. 2010) ....................................................... 27

*Chiang v. Verizon New England Inc.,*
595 F.3d 26 (1st Cir. 2010) ...................................... 13, 21, 27, 29

*Chuluunbat v. Experian Info. Sols., Inc.,*
4 F.4th 562 (7th Cir. 2021) ....................................................... 28

*Cortez v. Trans Union, LLC,*
617 F.3d 688 (3d Cir. 2010) ....................................................... 34

*DeAndrade v. Trans Union LLC,*
523 F.3d 61 (1st Cir. 2008) ................................................. 24, 25

*Denan v. Trans Union LLC,*
959 F.3d 290 (7th Cir. 2020) ........................... 4, 5, 21, 22, 27, 30

*Duall Bldg. Restoration, Inc. v. 1143 East Jersey Ave., Assocs.,*
652 A.2d 1225 (N.J. Super. Ct. App. Div. 1995) ....................... 41

*Erie Ins. Exchange v. Erie Indemnity Co.,*
68 F.4th 815 (3d Cir. 2023) ....................................................... 26

*Gross v. CitiMortgage, Inc.,*
33 F.4th 1246 (9th Cir. 2022) ........................... 18, 29, 30, 38, 39

*Hunt v. JP Morgan Chase Bank, Nat'l Ass'n,*
770 F. App'x 452 (11th Cir. 2019) ....................................... 27, 28

*Mader v. Experian Info. Solns.*,
  56 F.4th 264 (2d Cir. 2023)..............................................................*passim*

*Oakwood Labs. LLC v. Thanoo*,
  999 F.3d 892 (3d Cir. 2021) ....................................................... 17

*Pittman v. Experian Info. Sols., Inc.*,
  901 F.3d 619 (6th Cir. 2018)...................................................... 39

*Sarver v. Experian Info. Sols.*,
  390 F.3d 969 (7th Cir. 2004) ....................................................... 5

*Saunders v. Branch Banking & Trust Co. of Va.*,
  526 F.3d 142 (4th Cir. 2008).............................................30, 31

*Seamens v. Temple University*,
  744 F.3d 853 (3d Cir. 2014)...........................................6, 14, 34

*Sessa v. Trans Union, LLC*,
  74 F.4th 38 (2d Cir. 2023) ........................................16, 27, 38

*SimmsParris v. Countrywide Fin. Corp.*,
  652 F.3d 355 (3d Cir. 2011) ...................................................... 34

*Sorenson v. Sec'y of Treasury*,
  475 U.S. 851 (1986)..................................................................... 29

*TD Bank N.A. v. Hill*,
  928 F.3d 259 (3d Cir. 2019) ...................................................... 39

*Woytas v. Greenwood Tree Experts, Inc.*,
  206 A.3d 386 (N.J. 2019) ............................................................41

*Wright v. Experian Info. Sols., Inc.*,
  805 F.3d 1232 (10th Cir. 2015)................................................ 27

## Statutes

15 U.S.C. § 1681i.........................................................20, 24, 25, 28

15 U.S.C. § 1681s-2....................................................................*passim*

49 U.S.C. § 32705(c) .................................................................... 40

## Regulatory Provisions

12 C.F.R. Part 1022, Subpart E..................................................... 32

12 C.F.R. § 1022.41(a)................................................................. 32

12 C.F.R. § 1022.43(e) .................................................................. 5

49 C.F.R. Part 580, App. D..........................................................41

49 C.F.R. § 580.7 ...................................................................40, 42

49 C.F.R. § 580.8(b) .................................................................... 40

## Other Authorities

140 Cong. Rec. 8942 (1994) ........................................................ 6

*American Heritage College Dictionary* (3d ed. 1993) ................................17

*Black's Law Dictionary* (11th ed. 2019)....................................17, 18

CFPB, *Key Dimensions and Processes in the U.S. Credit Reporting System* (Dec. 2012) ..........................................4, 5, 21

H.R. Rep. No. 108-263 (2003)......................................................21

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1994).........................17

S. Rep. No. 103-209 (1993) ....................................................6, 26

S. Rep. No. 91-517 (1969) ............................................................ 4

## SUMMARY OF THE CASE

The Ritzes are attempting to make a federal case out of a state-law contract dispute. The parties disagree whether the Ritzes owed additional money under a lease agreement for failing to follow proper procedures. The Ritzes now seek to use the Fair Credit Reporting Act to hold Nissan Motor Acceptance Company LLC ("NMAC") liable for not resolving this contractual dispute in their favor. But FCRA's text and design confirm that it is not the proper mechanism for nuanced legal disputes like this.

On the last day of their vehicle lease, the Ritzes appeared unannounced at a New Jersey dealership without the required appointment to inspect their vehicle and to sign necessary lease-end paperwork, including an odometer disclosure statement required under federal law. Upon being reminded of these requirements at the dealership, the Ritzes threw their keys on a desk and walked out without taking the steps to properly return the car under their lease with NMAC. In accordance with the terms of their contract, NMAC charged the Ritzes another month's payment, totaling $181.51, which the Ritzes refused to pay, resulting in NMAC reporting the delinquency to credit bureaus.

Over the next four months, the Ritzes filed complaint after complaint disputing the debt, and NMAC repeatedly confirmed that, because the Ritzes

had not properly returned the car pursuant to the terms of their lease agreement, they owed an extra month's payment. As a matter of customer service, NMAC eventually chose to waive the debt and stop reporting the delinquency.

The Ritzes then sued NMAC under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), alleging that NMAC had unreasonably investigated their contract dispute. FCRA requires that a furnisher, upon receiving notice from a consumer reporting agency that a consumer has disputed the accuracy of information, investigate and correct any inaccuracy. But this duty is limited to confirming readily and objectively verifiable information, not resolving nuanced legal disputes over the best interpretation of a contract. FCRA's dispute mechanism, with its high volume, tight turnaround, and limited information, is not designed or intended to serve as a backdoor for consumers to challenge the validity or enforceability of their debts.

The contract dispute here is not readily and objectively verifiable. It turns on competing readings of the lease and demands the nuanced application of contract principles: Did the Ritzes fail to properly "return" the car, as required by the terms of the contract? Did they retain constructive "possession" of the car by not signing the required paperwork? As the District

Court properly held, FCRA did not require that NMAC investigate and resolve this legal dispute.

And NMAC has the better of this dispute either way. The Ritzes failed to properly return the car, so they still owed monthly payments under the lease. A month later, when the Ritzes returned and signed the necessary paperwork, NMAC stopped charging them. NMAC's later decision to waive the additional monthly payment and late fees it had charged the Ritzes between their visits to the dealership was a matter of customer service. That decision did not make NMAC's reporting of those debts inaccurate, as the District Court recognized. This Court should affirm.

## STATEMENT OF ISSUES

1. Did the District Court properly hold that the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), does not require furnishers to resolve legal disputes about the proper interpretation of a contract's terms, and that the Ritzes raised such a legal dispute here?

2. Alternatively, even if FCRA required a reasonable investigation here, did NMAC properly interpret the lease, such that it correctly reported the debt anyway?

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not previously been before this Court. Cases presenting the same legal issue are pending before the Fourth and Eleventh Circuits. *See Roberts v. Carter-Young, Inc.*, No. 23-1911 (4th Cir.); *Holden, Mayer, Belair v. Holiday Inn Club Vacations, Inc.*, Nos. 22-11014, 22-11734, 23-10101 (11th Cir.).

## STATEMENT OF THE CASE

### A.    The Fair Credit Reporting Act

The credit reporting system plays a "vital role" in the economy. S. Rep. No. 91-517, at 2 (1969). Consumers need credit to purchase cars or homes, or to start a business, or to go to college. Potential creditors, in turn, need information about these consumers to make "sound decisions." *Id.* Consumer reporting agencies gather this information into a single report so potential creditors can have a fuller picture of the consumer's creditworthiness.  *Denan v. Trans Union LLC*, 959 F.3d 290, 294 (7th Cir. 2020). Furnishers serve as the source of that information, both negative and positive. This credit reporting system is "vast." CFPB, *Key Dimensions and Processes in the U.S. Credit Reporting System* 3 (Dec. 2012). The three biggest credit reporting agencies—TransUnion, Experian, and Equifax—have files on over 200 million adults, and over 10,000 furnishers provide information to these agencies on 1.3 billion accounts a month. *Id.*

The Fair Credit Reporting Act regulates this system. Under the Act, furnishers are allowed to report information to consumer reporting agencies, "to incentivize the repayment of debts" and to help future creditors identify creditworthy candidates. *Denan*, 959 F.3d at 294; *U.S. Credit Reporting System* at 15. But that information must be complete and accurate, and a furnisher must update any information that it discovers is inaccurate. 15 U.S.C. §§ 1681s-2(a)(1)(A)–(B), 1681s-2(a)(2). "[G]iven the complexity of the system and the volume of information involved," "[o]ne can easily see how, even with safeguards in place, mistakes can happen." *Denan*, 959 F.3d at 294 (quoting *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 972 (7th Cir. 2004)). To account for those mistakes, FCRA also establishes an informal dispute mechanism for consumers to identify any errors. A consumer can file a dispute with a consumer reporting agency, and the agency must forward that dispute to the furnisher of the information. The furnisher then has to "conduct an investigation." 15 U.S.C. § 1681s-2(b)(1)(A). If the information is "inaccurate or incomplete or cannot be verified," the furnisher must "modify" or "delete" the information. *Id.* § 1681s-2(b)(1)(E). The consumer may also file a dispute directly with the furnisher, and the furnisher must follow a similar process. *See id.* § 1681s-2(a)(8)(E); 12 C.F.R. § 1022.43(e).

FCRA does not make furnishers strictly liable for any inaccuracies. "Although furnishers . . . are obligated to provide complete and accurate information to" consumer reporting agencies, "FCRA explicitly precludes private suits for failure to comply with that statutory duty." *Seamens v. Temple University*, 744 F.3d 853, 864 (3d Cir. 2014) (citing 15 U.S.C. § 1681s-2(c)–(d)). Instead, consumers must first give furnishers an opportunity to investigate and, if that investigation is unreasonable, consumers may then bring suit challenging the investigation.

In this way, FCRA "seeks to balance the needs of consumers and businesses," ensuring that the market has adequate—and accurate—information about consumers. S. Rep. No. 103-209, at 2 (1993). The Act does not demand "perfection" from furnishers, "just a good-faith effort." 140 Cong. Rec. 8942 (1994). The goal is "to provide incentives to businesses to supply accurate information while not discouraging them from furnishing it." *Id.* Absent this information, "[c]onsumers would be denied the credit to which they are entitled, and businesses would be unable to consummate sales." *Id.*

## B.    The Lease

Andrew and Michael Ritz leased a Nissan Sentra through a dealership in New Jersey in 2017. JA49. This lease was thereafter purchased by and assigned to Nissan Motor Acceptance Corporation, now known as Nissan Motor Acceptance Company LLC, who serviced the lease account.

The lease agreement made clear the requirements for returning the vehicle at the end of the two-year term. In a section titled "Vehicle Return," the lease explained that, "When your Lease terminates, . . . you will return the Vehicle to a Nissan dealer or other location we specify." JA51. "You will complete a statement of this Vehicle's mileage at termination as required by federal law." *Id.* "If you keep possession of this Vehicle past the end of the lease term, you will continue to pay the monthly payments." *Id.* "You will pay us for any damages we suffer because you failed to return this Vehicle at the end of the lease term." *Id.* "We may determine our damages in one of the following two ways at our election and in our sole discretion: a) by charging you the Total Monthly Payment for each month the Vehicle is not returned *as required* . . . or b) by charging you" the "Early Termination Charge," plus final fees, charges, and taxes. *Id.* (emphasis added). Elsewhere, the lease reiterated the consequences of failing to comply with these terms: If the Ritzes fail to "*timely* or *properly* perform any promise under this Lease,"

NMAC has the right to "sue you for damages and to recover this Vehicle." JA52 (emphases added).

The lease also explained another condition precedent to the return: an inspection. The lease noted that, "You are responsible for all repairs to this Vehicle that are not the result of normal wear and use," and "[a]t the end of the lease term . . . , you will pay us the amount it would cost for the repairs." *Id.* "[U]pon notice from us and allowed as by State law, you will make the Vehicle available to us prior to the scheduled termination of the Lease, at a reasonable time and place to be designated by us, so that we may inspect the Vehicle for purposes of determining excessive wear and tear." JA52.

Two years later, before the end of the original term, the Ritzes extended their lease for three more months, at $181.50 a month. JA55. The extension provided that "the provisions of your Lease Agreement will continue to govern all terms and conditions of your lease of the vehicle during the extension period." *Id.*

Two months before the end of the lease term, NMAC sent the Ritzes notice of the "steps" necessary "to help you complete your lease return." JA59. First, the Ritzes had to "[s]chedule your complimentary, but required, vehicle inspection." *Id.* This inspection would result in a "assessment . . . of chargeable wear and use." *Id.* The Ritzes then had to "[m]ake a vehicle-return

appointment with [the] Nissan [d]ealership," at which the Ritzes would "complete a Federal Odometer/Lease Termination Statement," as required by federal law. *Id.* Once this paperwork has been completed, the rental car would be "grounded," the lease "terminated," and the car taken back into inventory. JA103–05; JA348–49.

On August 9, 2019, the last day of the lease, the Ritzes showed up to the dealership without an appointment and without an inspection. JA162. The dealership could not accept the car. *Id.* The sales manager informed the Ritzes that the dealership could not meet with the Ritzes to inspect the car or complete the paperwork without an appointment. *Id.*; JA76. Instead of reaching out to NMAC for guidance, the Ritzes threw the keys on a desk and stormed out, without an inspection and without signing any paperwork. JA164–65.

Because the car had not been "returned as required," JA51, NMAC charged the Ritzes an additional monthly payment of $181.51. On September 20—a month late—the Ritzes returned to the dealership and signed the odometer statement, finally grounding the car and terminating the lease. JA42. The dealership (a distinct entity from NMAC) then sent NMAC a letter explaining that the Ritzes had "dropped off" the vehicle on August 9 and

"wanted it to be grounded and turned in but didn't want to follow procedure and abandoned the [v]ehicle." JA185.

## C.    The Credit Dispute

On September 26, the Ritzes complained to NMAC's customer service about the extra payment. Customer service may make requests on behalf of a customer, but it does not make any final decisions about the validity of debts or credit reporting. Here, customer service submitted a "service request" asking the credit reporting department to remove the extra payment from the Ritzes' files. The credit reporting department is responsible for reviewing and resolving all credit disputes submitted by customers. JA97, 202. In its service request, customer service attached the letter from the dealership and noted the Ritzes' complaint that the "[v]ehicle was returned 8/9/2019 but dealer grounded late." JA361.

The credit reporting department did not process the request. The letter from the dealership contained a typo in the VIN number. And, as the credit reporting department noted in its files, the reporting was accurate: "Rcvd SR dispute reason delinquency pay/history inquiry… reviewed trans history… found delinquency 1x30 (08/09/19) completed grounding 09/20/19… dealer did not admit fault for delq … *account reporting accurate*." JA369 (emphasis added). In other words, the department reviewed the Ritzes'

transaction history and the letter from the dealership and confirmed that, because the Ritzes completed their return a month late, they owed an additional month's payment.

The Ritzes continued to submit complaints to customer service. On October 23, NMAC sent a letter to the Ritzes informing them that its "research indicates that the information . . . regarding this account is accurate." JA156. The Ritzes called NMAC, and a representative informed them that NMAC was "unable to remove [the] reporting" because they had not followed the "proper process" and "abandoned" the car at the dealership. JA248–49. The Ritzes sent a letter on November 25, reiterating their complaints. JA154–155. NMAC reviewed the request, JA247, and on December 19, NMAC informed the Ritzes that its "position remains unchanged." JA157. The Ritzes continued to complain to customer service, and customer service submitted another service request. The credit reporting department did not process the request. Meanwhile, the credit reporting department reviewed fourteen disputes that it had received from Experian, Equifax, and Trans Union on behalf of the Ritzes, each time confirming that its reporting was accurate. JA210–37. The Ritzes also filed a complaint with the Consumer Financial Protection Bureau (CFPB).

On January 3, 2020, customer service submitted a third service request. JA324. The credit reporting department decided to remove the delinquency from the Ritzes' files as a matter of customer service on January 6, 2020 and immediately sent a notice to consumer reporting agencies to remove the information. ECF No. 67-23, at 2; JA238. Only four months had passed between the Ritzes' first complaint and NMAC's decision to remove the delinquency from its reporting to the credit bureaus. In that time, the Ritzes suffered no damages. They were not denied any credit cards, loans, mortgages, or insurance benefits. JA44–46.

**D.    This Suit**

The Ritzes sued NMAC, alleging that NMAC had violated FCRA by reporting inaccurate information to credit reporting agencies and failing to investigate that information upon receiving notice from the Ritzes that the information was inaccurate. *See* 15 U.S.C. § 1681s-2(b). NMAC moved for summary judgment, arguing that it had properly reported the Ritzes' debt and that FCRA did not require NMAC to investigate the Ritzes' legal dispute about the contract's terms.

The District Court granted summary judgment to NMAC. The Ritzes had raised "a legal question, not a factual inaccuracy" sufficient to support a claim under § 1681s-2(b). JA9. The Ritzes argued that the terms of the lease

did not permit NMAC to assess the additional month's payment because the Ritzes had physically returned the vehicle on August 9, even if they had not scheduled an appointment or inspection or signed the odometer statement or other paperwork. JA3–4, 8. As the District Court reasoned, that dispute turned not on the facts of the return but "on interpretations of 'possession' and 'return' under the lease." JA11. Indeed, the Ritzes' "briefing [was] replete with arguments that oft appear in breach-of-contract actions." *Id.* Ultimately, the Ritzes' claim was not that NMAC had inaccurately reported their debt but that NMAC had "failed to accept [their] interpretation of what the lease required of [them] to surrender possession of the vehicle properly and terminate the lease." JA12.

The District Court held that this legal dispute did not trigger NMAC's obligation to investigate. JA9, 11. As the court explained, a "contract dispute" could "only be resolved by a court of law," and a furnisher like NMAC was not "qualified nor obligated" to resolve that dispute. JA11–13 (quoting *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 35 (1st Cir. 2010)). In so holding, the District Court joined "[o]ther courts across the country" that had likewise held that furnishers are not required to resolve legal disputes. JA9.

The District Court also rejected the Ritzes' attempt to reframe this legal dispute as a factual inaccuracy. Customer service had generated several

service requests asking NMAC to remove the delinquency, but that was a matter of customer service, not a judgment that the debt was invalid. And "whether customer service chooses to resolve issues favorably to a consumer does not address whether the information was inaccurate." JA13–14. The Ritzes' attempt to characterize the dispute as factual did "not change the dispute's legal nature." JA13. This appeal followed.

## STANDARD OF REVIEW

This Court reviews the District Court's grant of summary judgment *de novo*. *Seamens*, 744 F.3d at 859. "Questions of statutory interpretation are also subject to *de novo* review." *Id.*

## SUMMARY OF ARGUMENT

The Fair Credit Reporting Act is not a vehicle for consumers to challenge the validity or enforceability of their debts. FCRA requires that a furnisher, upon receiving notice from a consumer reporting agency that a consumer has disputed the accuracy of information, investigate and correct any inaccuracy. This duty to investigate is limited to confirming readily and objectively verifiable information. It does not extend to resolving legal disputes about the validity or enforceability of a debt or the best interpretation of a contract or statute. The plain meaning of "accuracy" confirms this. So does the design and operation of FCRA's dispute mechanism.

Here, the Ritzes have raised a legal dispute that cannot be readily or objectively verified. The Ritzes' duty to properly return the leased vehicle, and NMAC's remedies after such breach, are issues of contract interpretation that NMAC is not required to or situated to resolve as part of a credit reporting dispute.

Alternatively, even if FCRA did require NMAC to investigate this dispute over the meaning of the contract, NMAC did so. Upon receiving the Ritzes' many disputes, NMAC reviewed and affirmed the validity of the debt. Because the Ritzes failed to follow the proper procedure and kept constructive possession of the vehicle, NMAC was entitled under the lease to charge the Ritzes another month's payment. NMAC ultimately decided to waive that payment as a matter of customer service, but that does not mean that its prior reporting was inaccurate.

## ARGUMENT

## I.     The District Court properly granted summary judgment because NMAC was not required to investigate a nuanced contract dispute about the validity of the Ritzes' debt.

FCRA requires that furnishers investigate the accuracy of a consumer's information. This means that furnishers must investigate "objectively and readily verifiable information." *Mader v. Experian Info. Sols., Inc.*, 56 F.4th 264, 269 (2d Cir. 2023). Furnishers are not required to resolve legal disputes

15

that "evade[] objective verification" and turn on the best interpretation of statutory or contractual terms. *Id.* The Ritzes raised such a legal dispute with NMAC, arguing that they had sufficiently "returned" the vehicle and given up "possession" as required by the terms of the lease. That dispute is not objectively and readily verifiable, as illustrated by the parties' contractual arguments before the District Court and on appeal. NMAC thus did not have an obligation under 15 U.S.C. § 1681s-2(b) to investigate the Ritzes' contractual dispute.

### A.     Under FCRA, furnishers need investigate only objectively and readily verifiable information.

The District Court held that furnishers are required to investigate only factual inaccuracies, not legal disputes. Put another way, as the Second Circuit recently explained, the challenged information must be "objectively and readily verifiable" to be actionable under FCRA. *Sessa v. Trans Union, LLC*, 74 F.4th 38, 43 (2d Cir. 2023). This reading is dictated by FCRA's text and design and confirmed by the weight of the precedent.

### 1.     The ordinary meaning of "accuracy" refers to objectively and readily verifiable information.

FCRA provides that, upon "receiving notice . . . of a dispute with regard to the completeness or accuracy of any information provided by a [furnisher] to a consumer reporting agency, the [furnisher] shall . . . conduct an investigation with respect to the disputed information." 15 U.S.C. § 1681s-

2(b)(1)(A). If the information "is found to be incomplete or inaccurate or cannot be verified," the furnisher must remove that information. *Id.* § 1681s-2(b)(1)(E). Whether a furnisher has a statutory duty to investigate turns on whether the "accuracy" of the information has been disputed. FCRA does not define accuracy, so its meaning must be understood in light of its ordinary usage and context. *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 908–10 (3d Cir. 2021).

Ordinarily understood, accuracy "requires a focus on objectively and readily verifiable information." *Mader*, 56 F.4th at 269. Dictionaries at the time that § 1681s-2 was passed defined accuracy or accurate as "[c]onformity to fact," *American Heritage College Dictionary* (3d ed. 1993), "freedom from mistake or error" or "conforming exactly to truth," *Merriam-Webster's Collegiate Dictionary* (10th ed. 1994). These definitions reflect that, in plain English, something is accurate or inaccurate if it can be objectively proven true or false.

This meaning is supported by the verb that Congress chose to describe how furnishers are supposed to confirm accuracy: "verif[y]." 15 U.S.C. § 1681s-2(b)(1)(E). To verify means "[t]o prove to be true; to confirm or establish the truth or truthfulness of; to authenticate." Def. 1, *Black's Law*

17

*Dictionary* (11th ed. 2019). For credit information to be "verified," 15 U.S.C. § 1681s-2(b)(1)(E), it must be objectively proven to be right or wrong.

In the FCRA context, information is inaccurate if a furnisher has identified the wrong individual as owing a debt, or listed the wrong amount for the debt, or calculated the wrong date for a payment. In each of these scenarios, the information can readily be confirmed by reference to objective criteria: Is this the right John Smith, as proven by a driver's license or Social Security number? Is the debt actually for $1,000, as stated in the loan agreement? Have sufficient days passed, such that the payment is past due?

In comparison, legal disputes are not naturally referred to as being accurate or inaccurate, or true or false, or verifiable. The existence of a particular case or statute can be verified, as can the language of that case or statute. And in some circumstances, "a legal question [may be] sufficiently settled" such that the law can be straightforwardly and uncontroversially applied to the facts at hand. *Mader*, 56 F.4th at 271; *see, e.g.*, *Gross v. CitiMortgage, Inc.*, 33 F.4th 1246, 1251–52 (9th Cir. 2022) (state statute clearly abolished consumer's liability for debt that furnisher reported). But furnishers cannot verify the "unsettled meaning" of a case, statute, or contract. *Mader*, 56 F.4th at 269.

An interpretation of a contract or the construction of a statute may be the "best" reading, but not the only possible or plausible one. A court, in adopting a best reading, typically does not say that other readings are "inaccurate," because legal debates do not turn on objectively verifiable criteria. This is especially so where reasonable minds disagree and "[c]ourts have taken different approaches . . . and have reached different conclusions" on the law. *Mader*, 56 F.4th at 269.

Plainly read, FCRA demands that furnishers investigate information that is readily and objectively verifiable. That does not include legal disputes that require nuanced legal analysis beyond the "straightforward application of law to facts" and about which reasonable legal minds could disagree. *Id.* at 270. Such disputes cannot be verified, and so are not "a dispute with regard to . . . accuracy." 15 U.S.C. § 1681s-2(b)(1)(A).

### 2. *Structure and design confirm that accuracy refers to objectively and readily verifiable information.*

The duty to investigate arises as part of FCRA's dispute mechanism. Both creditors and consumers have an interest in ensuring that credit information is accurately reported. But the credit system is vast, and it is inevitable that some mistakes will be made. To streamline the process for fixing these inaccuracies, FCRA mandates an internal dispute mechanism for

19

both furnishers and consumer reporting agencies. Once a consumer notifies a furnisher of the purported inaccuracy and provides supporting documentation, the furnisher must "conduct an investigation," "review all relevant information provided by the consumer reporting agency," and "report the results." 15 U.S.C. § 1681s-2(b)(1)(A)–(C). If the furnisher, through its investigation, finds that the information is "inaccurate or incomplete"—or if the information "cannot be verified"—the furnisher must "modify" or "delete" that information and report that result to consumer reporting agencies. *Id.* § 1681s-2(b)(1)(D)–(E). Furnishers have 30 days to conduct this investigation and report the results. *Id.* §§ 1681s-2(b)(2), 1681i(a)(1)(A).

This streamlined process is designed for objectively and readily verifiable information—not nuanced legal disputes about which reasonable minds could disagree. Furnishers process vast numbers of disputes per year, and these disputes are handled by lay people. And the furnisher has just thirty days to complete this investigation and report the results. That is a feasible task for readily verifiable information that can be confirmed through objective documentation but not nuanced legal disputes.

Congress designed the dispute mechanism this way to provide consumers with an easy, informal way to challenge their reported

information without imposing an undue, and infeasible, burden on furnishers. Anyone who reports information about a consumer's financial status counts as a furnisher, including "credit card issuers, auto dealers, department and grocery stores, lenders, utilities, insurers, collection agencies, and government agencies"—a range of more and less sophisticated actors. *Chiang*, 595 F.3d at 35 n.7 (quoting H.R. Rep. No. 108-263, at 24 (2003)). These furnishers supply information on over 1.3 billion consumer accounts. *U.S. Credit Reporting System* at 3. Consumer reporting agencies receive about 8 million disputes a year, which are forwarded on to furnishers. *Id.* at 4.

Furnishers have long universally employed lay people to investigate this multitude of disputes. These lay employees, and furnishers in general, are generally not "qualified . . . to resolve matters" within the confines of FCRA's dispute mechanism "that turn on questions that can only be resolved by a court of law." *Chiang*, 595 F.3d at 38. They have no expertise in resolving colorable or complex "legal issues" and "defenses." *Denan*, 959 F.3d at 295. These disputes require "bespoke attention" and nuanced legal reasoning unfit for FCRA's dispute mechanism. *Mader*, 56 F.4th at 270.

On the other hand, furnishers are competent to investigate and resolve readily and objectively verifiable information within FCRA's dispute

mechanism. Indeed, furnishers resolve such disputes every day. They may refer to a driver's license or Social Security number to confirm the identity of a debtor, or look to the face of the contract to determine the amount owed each month, or review the payment confirmation submitted by the consumer to determine that the consumer did actually pay the bill.

To be sure, furnishers do sometimes address hard questions about a debt, like whether to charge or sue on the debt where the contract or law is not crystal clear. But those decisions are made by specialized departments versed in those issues and independent of FCRA's tight 30-day timeline. And "[n]o amount of resources could empower [a furnisher] to assume the role of a tribunal" and finally decide the validity or enforceability of a debt. *Denan*, 959 F.3d at 297.

As demonstrated by its limitations, FCRA's dispute mechanism is not intended to serve as the tribunal for challenging the validity of a debt. "Only a court can fully and finally resolve the legal question of a loan's validity," or the interpretation of a contract's terms, or the dischargability of a debt. *Id.* at 295. Because legal disputes cannot be verified, cramming these disputes into FCRA's definition of accuracy would provide consumers with a get-out-of-debt-free card. Consumers could raise any number of legal challenges and defenses to their debts. If the furnisher is unable to readily and objectively

conclude that these defenses fail, does the furnisher lack "a sufficient basis to verify the debt," such that it must stop reporting it? Both the Ritzes and the CFPB have urged yes. *See* CFPB Br. 23–24; Ritzes' Br. 43–44. FCRA's dispute mechanism is not designed for that. Consumers can raise their legal challenges in court, or they can negotiate their debt with the creditor. But they cannot attempt to attack the *validity* of that debt by challenging the *reporting* of the debt and then suing for damages under FCRA when the furnisher affirms the debt.

The Ritzes do not address the strictures of FCRA's dispute mechanism. Instead, they object that if furnishers are not required to investigate nuanced legal disputes, furnishers "could decline to conduct any investigation at all," or could even "intentionally report[] false information." Ritzes' Br. 31. But furnishers have incentives to report accurate information, as they themselves are users of credit reports and benefit from accurate reports that help them identify creditworthy consumers. And no furnisher is likely to forgo an investigation altogether. To do so would bypass an early opportunity to quickly resolve a potential complaint a customer may have. And as a practical matter, furnishers will likely undertake an initial assessment of the customer's claim and the offered documentation, even if only to ascertain whether a piece of information is readily and objectively verifiable.

Although furnishers are not required to investigate and resolve nuanced legal disputes, that does not mean that consumers have no opportunity to challenge their debts. Consumers can always go to court and argue that their debts are invalid or unenforceable. Or consumers may negotiate directly with the furnisher, as the Ritzes did here by submitting complaints to customer service. Once consumers have won a favorable ruling in court or reached agreement with a creditor, then the status of their debt becomes objectively and readily verifiable, and the furnisher must adjust its reporting.

In the meantime, FCRA allows consumers to include a "statement of dispute" in their file at the consumer reporting agency. 15 U.S.C. § 1681i(b)–(c); *see DeAndrade v. Trans Union LLC*, 523 F.3d 61, 69 (1st Cir. 2008) (noting this "alternative remedy for consumers"). "In this way, potential creditors have both sides of the story and can reach an independent determination of how to treat a specific, disputed account." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 n.23 (11th Cir. 1991), *abrogated in irrelevant part by Santos v. Healthcare Revenue Recovery Grp.*, 90 F.4th 1144, 1156 (11th Cir. 2024). The Ritzes claim that this option will be "lost" to consumers if furnishers do not have a duty to investigate nuanced legal disputes. Ritzes' Br. 32. But just because a legal issue is not

verifiable does not mean that it is not disputed. *See DeAndrade*, 523 F.3d at 69 (noting that a consumer had this option even though consumer reporting agency did not have a duty to investigate the dispute because it turned on a legal issue).

The ill fit between FCRA's dispute mechanism and nuanced legal disputes is particularly stark as applied to consumer reporting agencies. Like furnishers, consumer reporting agencies are also required to investigate "the completeness or accuracy of any item of information." 15 U.S.C. § 1681i(a)(1)(A). Reading "accuracy" for furnishers to include legal disputes means that the same duty applies to consumer reporting agencies. Like furnishers, consumer reporting agencies are not qualified to resolve nuanced legal disputes that require "bespoke attention and legal reasoning" and about which reasonable minds could disagree. *Mader*, 56 F.4th at 270. And just like with furnishers, requiring consumer reporting agencies to resolve such legal disputes would allow a debtor to "launch[] an impermissible collateral attack against a lender" by requiring the consumer reporting agency to adjudicate liabilities and defenses. *DeAndrade*, 523 F.3d at 68.

The Ritzes ignore FCRA's design in favor of an appeal to the Act's purpose, asserting that furnishers should be required to investigate and resolve *all* legal disputes, no matter how complex, because the Act seeks to

protect consumers and ensure accurate reporting. No doubt, FCRA aims to promote accurate and fair credit reporting. But that is not its only purpose. Instead, the Act strives to "balance the needs of consumers and businesses." S. Rep. No. 103-209, at 2 (1993). That is why, for example, FCRA requires only that an investigation be reasonable, not perfect. "[N]o legislation pursues its purposes at all costs, and [courts] are not free to rewrite this statute (or any other) as if it did." *Erie Ins. Exchange v. Erie Indemnity Co.*, 68 F.4th 815, 820 (3d Cir. 2023). "Indeed, it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Id.* "[P]olicy concerns cannot trump the best interpretation of the statutory text." *Id.* at 821. And here, the best interpretation is that accuracy refers to readily and objectively verifiable information, not nuanced legal disputes.

### 3. *The weight of the precedent indicates that furnishers are required to investigate only objectively and readily verifiable information.*

The consensus of the Courts of Appeals confirms this definition of "accuracy." Although courts have adopted varying articulations, they generally agree that furnishers and consumer reporting agencies are only required to investigate objectively and readily verifiable information, not legal disputes involving the nuanced interpretation of contracts, statutes, or

caselaw. No court has gone so far as to hold that they are required to investigate *every* type of dispute, even nuanced legal ones, as the Ritzes and CFPB suggest.

The most recent Court of Appeals to weigh in, the Second Circuit, has adopted the articulation that NMAC urges here: FCRA requires the investigation of "objectively and readily verifiable" information, *Sessa*, 74 F.4th at 43, not disputes that require "bespoke attention and legal reasoning," *Mader*, 56 F.4th at 270.

Most courts to confront the issue, including the District Court below, have followed a slightly different articulation, holding that a consumer must identify a factual inaccuracy, not a legal one. *See Chiang*, 595 F.3d at 38 (a consumer must identify a "factual inaccuracy, rather than . . . disputed legal questions"); *Denan*, 959 F.3d at 296 (consumer must identify "factually inaccurate information," not "legal issues"); *Carvalho v. Equifax Info. Servs.*, 629 F.3d 876, 892 (9th Cir. 2010) (consumer must identify a factual inaccuracy, not merely "a legal defense"); *Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1242 (10th Cir. 2015) ("A reasonable reinvestigation . . . does not require CRAs to resolve legal disputes about the validity of the underlying debts they report."); *Hunt v. JP Morgan Chase Bank, Nat'l Ass'n*,

770 F. App'x 452, 458 (11th Cir. 2019) ("A plaintiff must show a factual inaccuracy rather than the existence of disputed legal questions.").

This factual-legal heuristic tracks the Second Circuit's test. A factual issue is objectively and readily verifiable, and a legal dispute is usually not. Factual issues include pure factual errors and the straightforward application of law to facts. *See Chuluunbat v. Experian Info. Sols., Inc.*, 4 F.4th 562, 568 (7th Cir. 2021). Is this the right person? The right amount? When did the payment become due? Has a court adjudicated this debt as invalid or discharged? Legal disputes, in contrast, involve debatable questions of law that require "interpreting legal rights to a debt and making legal judgments." *Id.* at 569. Is this a valid debt or lien? How should the contract's terms be interpreted? Does a statute discharge this debt under these specific circumstances? Does the consumer have any other defenses to the debt? These disputes require "bespoke attention and legal reasoning." *Mader*, 56 F.4th at 270.

The Ritzes dispute this uniformity, arguing that because several of these cases involved consumer reporting agencies rather than furnishers, they are inapplicable. But just as § 1681s-2(b)(1) requires furnishers to investigate "the completeness or accuracy of any information," so too does § 1681i(a)(1)(A) require consumer reporting agencies to investigate "the

completeness or accuracy of any item of information." "The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning." *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986). The definition of "accuracy" for consumer reporting agencies should thus be the same as it is for furnishers. Consumer reporting agencies and furnishers have "parallel obligations," and neither are resolved to investigate "disputed legal questions." *Chiang*, 595 F.3d at 37–38.

The Ritzes rely on three cases, from the Ninth, Seventh, and Fourth Circuits, in arguing otherwise. But these courts have not adopted the rule that the Ritzes say they have. Instead, they have reasoned along the same line as their sister circuits.

To start, the Ninth Circuit has said that furnishers may "*sometimes*" be required "to investigate, and even to highlight or resolve, questions of legal significance." *Gross*, 33 F.4th at 1253 (emphasis added). In *Gross*, the Ninth Circuit addressed an Arizona statute that clearly and unambiguously abolished a homeowner's liability for a mortgage after foreclosure, yet the furnisher continued to report the mortgage as a debt. *Id.* at 1251. The consumer had thus disputed objectively and readily verifiable information. The Ninth Circuit did not say, as the Ritzes argue, that all legal disputes must

be resolved.  Nor did the Ninth Circuit indicate that a contract dispute like the one at issue here would be one of the legal disputes that furnishers must "sometimes" act on. *Id.* at 1253.

The Seventh Circuit has suggested that furnishers may be better equipped than consumer reporting agencies "to determine the legality of a disputed debt." *Denan*, 959 F.3d at 295. But the Seventh Circuit did not assert that furnishers have a duty to investigate *all* legal disputes. The court did not even have a furnisher before it in *Denan*. Furnishers may be better situated than consumer reporting agencies to investigate factual disputes about a debt, because "they assumed the risk and bear the loss of unpaid debt." *Id.* But they are just as ill fitted to resolving nuanced legal disputes in the FCRA context and on the FCRA timeline when such disputes require "procedures" only "tribunals . . . can perform" and arguments only tribunals can resolve. *Id.* As the Seventh Circuit noted, "[t]he correct way to resolve legal defenses to [the consumer's] loans was in a lawsuit against those lenders," not through FCRA's dispute mechanism. *Id.* at 296.

Finally, the Fourth Circuit has not addressed this issue. In *Saunders*, a furnisher failed to include a consumer's dispute of his debt in its reporting. *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 149 (4th Cir. 2008). FCRA requires furnishers to inform credit reporting agencies when

information is disputed by the consumer. 15 U.S.C. § 1681s-2(a)(3); *Saunders*, 526 F.3d at 149. The Fourth Circuit held that the furnisher's "decision to report the debt without *any* mention of a dispute was misleading," making the reporting incomplete. *Id.* at 150.

*Saunders* is not relevant here. The Ritzes have never suggested that NMAC failed to inform consumer reporting agencies that they disputed their delinquency. NMAC processed fourteen different dispute notifications from the Ritzes, each time noting the dispute and confirming the debt. JA210–37. The *Saunders* court never addressed the issue raised here—whether the furnisher had a duty to investigate and resolve disputes about the validity of the debt.

To the extent that there is any daylight between the different articulations from the Courts of Appeals, that daylight does not aid the Ritzes. None of these Circuits has adopted the Ritzes' and CFPB's argument that furnishers have an obligation to investigate *every* type of dispute about the validity of a debt. And no Circuit has held that a reasonably disputable legal issue can create an actionable "inaccuracy." This Court should not break new ground.

### 4. *The CFPB's regulations do not require furnishers to investigate legal disputes.*

Administrative interpretations of FCRA do not demand otherwise. The CFPB has promulgated regulations implementing FCRA's obligations for furnishers. *See* 12 C.F.R. Part 1022, Subpart E. These regulations define "accuracy" to "mean[] that information that a furnisher provides . . . correctly: (1) [r]eflects the terms of and liability for the account or other relationship; (2) [r]eflects the consumer's performance and other conduct with respect to the account or other relationship; and (3) [i]dentifies the appropriate consumer." 12 C.F.R. § 1022.41(a). The regulations also provide that "a furnisher must conduct a reasonable investigation . . . if it relates to . . . [t]he consumer's liability for a credit account or other debt with the furnisher, such as direct disputes relating to whether there is or has been identity theft or fraud against the consumer, whether there is individual or joint liability on an account, or whether the consumer is an authorized user of a credit account." *Id.* § 1022.43(a).

The Ritzes argue that, to investigate and correctly report a consumer's liability for a debt and the terms of that debt, a furnisher "necessarily" must consider and resolve legal issues involving that debt. Ritzes' Br. at 34–35. They read too much into these regulations. Usually, the terms and liability of a debt, the consumer's performance on the debt, and the consumer's identity

32

are all objectively and readily verifiable. The fact that furnishers are required to correctly report that information in those situations says nothing about whether furnishers are required to resolve *all* disputes or defenses as to the validity of a debt.

The CFPB now suggests otherwise. In recent briefs filed before this Court and others, the CFPB and FTC have asserted that furnishers and consumer reporting agencies are required to investigate and resolve all legal disputes. According to the Ritzes, this new-found interpretation should be entitled to deference. But an agency's litigation position is not entitled to deference absent an "official interpretation of its regulation" or at least some sort of "prior policy statement." *Appalachian States Low-Level Radioactive Waste Comm'n v. Pena*, 126 F.3d 193, 198 (3d Cir. 1997). The CFPB has pointed to neither of those here.

### 5.    *A furnisher's duty to investigate legal disputes should not be left to a jury.*

At bottom, both the Ritzes and the CFPB recognize that FCRA does not expect furnishers to investigate legal disputes that require bespoke attention and legal reasoning. But according to them, FCRA accommodates this concern elsewhere, in the requirement that a furnisher's investigation be reasonable. *See* Ritzes' Br. 43; CFPB Br. 22.  This is not the solution that

Congress intended, as indicated by FCRA's text and design, and this Court should not adopt it.

When the law requires an investigation, furnishers must undertake a "reasonable" investigation. *Seamans*, 744 F.3d at 864 (quoting *SimmsParris v. Countrywide Fin. Corp.*, 652 F.3d 355, 359 (3d Cir. 2011)). Reasonableness is a mixed question of law and fact, so it is generally left to the jury "unless the reasonableness or unreasonableness of the procedures is beyond question." *Id.* at 864–65. "[R]easonable procedure is one 'that a reasonably prudent person would undertake under the circumstances.'" *Id.* (quoting *Cortez v. Trans Union, LLC*, 617 F.3d 688, 709 (3d Cir. 2010)). In this Circuit, as in others, there are no bright-line rules for reasonableness. Instead, reasonableness is a balancing test in which "the factfinder must balance 'the potential harm from inaccuracy against the burden of safeguarding against such inaccuracy.'" *Id.* at 865 (quoting *Cortez*, 617 F.3d at 709).

The Ritzes have not identified what would constitute a reasonable investigation into a nuanced legal dispute. Is it sufficient for the furnisher to find that it has an arguable reading of a contract or statute, or must the furnisher be certain that it has the best reading? Is it enough to have one lower court case on point, or must the issue be finally settled by a court of

last resort? What if courts disagree, or the law is not clear, as is often the case? The Ritzes offer no answers to any of these questions. They do concede that "an intricate or novel legal argument" may require an "unduly burdensome investigation." Ritzes' Br. 43. But the Ritzes offer no meaningful guidelines or standards for the steady march of legal issues that furnishers will face on a daily basis, instead suggesting that the investigation of these issues should be resolved on a "case-by-case" basis by juries. Ritzes' Br. 34.

Leaving a furnisher's duty to investigate nuanced legal disputes to a lay jury is a ready-made way to coerce furnishers into settlement. It is one thing for a jury to assess the reasonableness of a furnisher's factual investigation into objectively verifiable information. It is another thing entirely for lay jurors to comb through a contract, statute, or caselaw to judge the reasonableness of an investigation into a nuanced legal dispute. Just as jurors are unqualified to decide what the law is, so too are they ill equipped to ascertain if a furnisher's analysis of the law and application of the law to the facts of a dispute is adequate. Furnishers and consumers will inevitably call dueling legal experts to opine on the reasonableness of the furnisher's legal analysis. Furnishers may have to make thorny decisions about privilege waivers. And because reasonableness is intertwined with accuracy, the trial will inevitably become about the validity of the debt itself. None of this makes

35

sense in the context of a statute set up to address credit *reporting* and the straightforward factual errors that inevitably result from the millions of pieces of information transmitted to consumer reporting agencies daily.

## B.   The Ritzes dispute information that is not objectively and readily verifiable.

In sum, furnishers are only required to investigate information that is objectively and readily verifiable. Here, the Ritzes have raised a nuanced dispute of contract interpretation that is not objectively and readily verifiable.

The lease agreement instructed the Ritzes that they had to "return the Vehicle to a Nissan dealer or other location we specify," "complete a statement of this Vehicle's mileage at termination," and "[u]pon notice from us . . . , make the Vehicle available . . . so that we may inspect the Vehicle for purposes of determining excessive wear and tear." JA51–52. Prior to the end of the Ritzes' lease, NMAC notified the Ritzes that they had to "[m]ake a vehicle-return appointment with [the] Nissan [d]ealership," at which the Ritzes would "complete a Federal Odometer/Lease Termination Statement." JA59. The Ritzes did none of those things. They did not make an appointment to inspect or return the car, nor did they sign the odometer statement or any other paper. Instead, the Ritzes threw the keys on the

counter and left the car at the dealership without grounding the car and terminating the lease.

Under the lease agreement, if the Ritzes kept "possession of this Vehicle past the end of the lease term," they would "continue to pay the monthly payments" "for each month the Vehicle is not returned as required." JA51. Following those terms, NMAC charged the Ritzes an extra month's payment because they did not return the car as specified in the lease.

The parties now vigorously disagree whether the Ritzes failed to satisfy the terms of the lease agreement, such that NMAC had the right to charge the Ritzes an extra month's payment. That contract dispute is a quintessential legal dispute that requires bespoke attention and legal reasoning and cannot be objectively or readily verified.

Below, the "briefing [was] replete with arguments that oft appear in breach-of-contract actions." JA11. The Ritzes argued that the lease only allowed NMAC to charge the Ritzes if they kept "possession" of the vehicle, and the Ritzes physically returned the vehicle on the due date, "return[ing] and surrender[ing] possession on time." ECF No. 67, at 11–13. NMAC responded that, although the Ritzes may have given up physical possession of the car, they did not follow the proper procedures or sign the paperwork necessary to terminate the lease and so had not actually "returned" the

vehicle and surrendered "possession" as required by lease. ECF No. 71, at 5–8. As the District Court noted, this disagreement turns on an in-depth analysis of the lease's text and principles of contract law; it cannot be "verified" with documentation or objective criteria. JA11.

This is apparent when compared to legal disputes that are readily and objectively verifiable. For example, in *Gross*, "a statute had abolished [the] plaintiff's obligation to repay the debt." JA14. On its face, the statute explicitly provided that "no action may be maintained to recover any difference between the amount obtained by sale [of a house in foreclosure] and the amount of the indebtedness." *Gross*, 33 F.4th at 1251. Despite this clear text, the furnisher had continued to report the former homeowner as owing money on the mortgage. *Id.* at 1249. The homeowner even identified this statutory citation for the furnisher, but the furnisher continued to report the debt. *Id.* at 1250. That was, as the Ninth Circuit reasoned, "patently incorrect." *Id.* at 1252. Similarly, in *Sessa*, the consumer reporting agency had reported that the consumer owed a balloon payment at the end of her car lease for $19,000. 74 F.4th at 41. The "plain language" of the lease made clear that the "residual value" of the car was $19,000 and that the consumer had the option—but no obligation—to purchase the car for that price at the end of the lease. *Id.* Here, in comparison to both of those cases, "no statute,"

38

caselaw, or contract term has readily and objectively "made NMAC's reporting inaccurate." JA14.

## II. NMAC properly reported the Ritzes' obligations.

Even if FCRA did impose a duty for NMAC to investigate the Ritzes' contractual dispute, the Ritzes still cannot sustain this suit against NMAC. To bring a claim under § 1681s-2(b)(1) for an unreasonable investigation, the Ritzes must show that the reported information was inaccurate or incomplete. "[A] threshold showing of inaccuracy or incompleteness is necessary in order to succeed on a claim under § 1681s-2(b)." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 629 (6th Cir. 2018). "[I]f there is no inaccuracy, then the reasonableness of the investigation is not in play." *Gross*, 33 F.4th at 1251. The District Court did not reach this ground, but this Court may affirm the judgment below "on any basis supported by the record." *TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019). And the record makes clear that NMAC has the right reading of the contract: the Ritzes owed an additional month's payment because they failed to properly return the car and because they retained constructive possession for an additional month.

### A. NMAC properly concluded that the Ritzes owed an additional month's payment for failing to follow proper procedure and for retaining constructive possession of the car.

The lease provided that, at the end of the lease term, the Ritzes had to comply with certain procedures to return the Vehicle "*as required.*" JA51 (emphasis added). "Upon notice from" NMAC, the Ritzes had to "make the Vehicle available . . . at a reasonable time and place designated by" NMAC for an inspection. JA52. The Ritzes also had to "complete a statement of this Vehicle's mileage at termination as required by federal law." JA51. Two months before the end of the term, NMAC gave the Ritzes "notice" under the contract that they had to "[s]chedule [a] complimentary, but required, vehicle inspection." JA59. It also informed the Ritzes that they had to "[m]ake a vehicle-return appointment with [the] Nissan [d]ealership," at which the Ritzes would "complete a Federal Odometer/Lease Termination Statement." *Id.*

Under the Federal Truth in Mileage Act and accompanying regulations, lessees must sign a federal odometer statement, or a disclosure of a car's mileage, before returning it to the lessor, which the lessor must keep for five years. *See* 49 U.S.C. § 32705(c); 49 C.F.R. §§ 580.7, 580.8(b). This is intended to prevent odometer fraud in used cars. As the odometer statement warns, "[f]ailure to complete" this statement "may result in fines and/or

imprisonment." 49 C.F.R. Part 580, App. D. For car leases, this odometer statement is a "trigger mechanism" that finally grounds the car and officially terminates the lease. JA354. That is why the lease made clear, under the header of "Vehicle Return," that this odometer statement was a condition of the return. JA51.

The Ritzes did not comply with any of these requirements. "A party violates the terms of a contract by failing to fulfill a requirement enumerated in the agreement," *Woytas v. Greenwood Tree Experts, Inc.*, 206 A.3d 386, 392 (N.J. 2019), or necessarily implicit in its terms, *see Duall Bldg. Restoration Inc. v. 1143 East Jersey Ave., Assocs.*, 652 A.2d 1225, 1235 (N.J. Super. Ct. App. Div. 1995). The Ritzes did not make an appointment or schedule an inspection—despite two months' advance notice—but instead showed up to the dealership and demanded that the dealership accept the car. The dealership informed the Ritzes that it could not inspect the car and sign the paperwork without an appointment. The Ritzes tossed the keys on a desk and walked out. The Ritzes thus failed to return the car "as required." That failure to follow the required procedure breached the lease agreement. JA51. The lease warned the Ritzes that "you will continue to pay the monthly payments" if "the Vehicle is not *returned as required*." JA51 (emphasis

added). Because the Ritzes failed to return the car "as required," NMAC rightly charged the Ritzes for an extra month's payment.

Moreover, by failing to sign an odometer statement, the Ritzes also kept constructive "possession of this Vehicle past the end of the lease term." JA51. The lease could not terminate, and proper legal possession of the car could not transfer, until the Ritzes signed the federal odometer statement. So it did not matter that the Ritzes physically abandoned the car in the dealership's parking lot. Without the signed odometer statement, the dealership could not take the car back into inventory or lease the car out to another customer. It would have been illegal for them to do so. *See* 49 C.F.R. § 580.7.

This is akin to a customer renting a moving van to move across the country. The customer signs a contract, agreeing to return the van to a designated location. Halfway across the country, the customer changes his mind and drops the van off in the parking lot at one of the company's storefronts without informing the company. The company charges the customer for not following the agreed upon procedure. The customer cannot reasonably object; he failed to comply with the terms of their agreement.

Because the Ritzes kept constructive possession of the car for an extra month, they incurred another monthly payment. As the lease stated, "If you

keep possession of this Vehicle past the end of the lease term, you will continue to pay the monthly payments." JA51. The Ritzes eventually came back and signed the odometer statement, finally grounding the vehicle and allowing NMAC to take possession of the car under federal law. But for that month between, NMAC was within its rights under the lease to charge the Ritzes for an extra month's payment.

NMAC thus had two bases under the contract to charge the Ritzes an extra month's payment of $181.51. The Ritzes refused to pay. Once that bill became past due, NMAC rightly reported that delinquency to the credit reporting agencies.

### B. NMAC did not determine that the debt was invalid and yet continue to report it.

On appeal, the Ritzes do not meaningfully contest NMAC's interpretation of the lease. Instead, the Ritzes retreat to arguing that, accepting NMAC's interpretation of the contract, NMAC still reported a factual inaccuracy because the company had decided that the Ritzes did not owe the additional month's payment after all yet continued to report the money as currently owed.

The District Court rejected this argument, JA13–14, and this Court should too. As the District Court explained, NMAC never decided that its reporting was inaccurate and then failed to correct that reporting. Instead,

NMAC ultimately chose to stop reporting the debt as a matter of customer service.

Throughout this four-month dispute, "NMAC consistently maintained that its reporting was accurate." JA13. NMAC's credit reporting department reviewed the Ritzes' dispute and confirmed that they owed money under the lease agreement: "Rcvd SR dispute reason delinquency pay/history inquiry... reviewed trans history... found delinquency 1x30 (08/09/19) completed grounding 09/20/19... dealer did not admit fault for delq ... *account reporting accurate*." JA369 (emphasis added). NMAC "reiterated" this conclusion in two letters to the Ritzes and in almost a dozen responses to consumer reporting agencies. JA13.

Despite NMAC's clear and repeated affirmations, both internally and externally, that the reporting was accurate, the Ritzes argue that NMAC had actually already waived the debt and yet continued to report the delinquency anyway. Bombarded by requests from the Ritzes to stop reporting the debt, NMAC's customer service submitted three requests asking the credit reporting department to do so. *See, e.g.*, JA361 ("Please remove August delinquency."). The Ritzes pitch these requests as an official, company-wide determination that that the Ritzes did not actually owe any money for failing to properly return the car.

44

But that internal request from customer service to the credit reporting department was not itself a waiver of the Ritzes' debt, or a conclusion that the Ritzes did not owe money under the contract. As the District Court reasoned, "whether customer service chooses to resolve issues favorably to a consumer does not address whether the information was inaccurate." JA14. As its name shows, the credit reporting department, not customer service, is "the department responsible for [NMAC's] credit reporting." JA318–19. Although customer service can request a removal of certain information, the credit reporting department "can check everything, and if they don't agree, they can override the person [from customer service] that's requesting [the change]." JA202.

Here, the credit reporting department rejected the first two service requests. The "account reporting [was] accurate" because the Ritzes had grounded the car late. JA369. So NMAC continued to report that information. Customer service submitted a third service request on January 3, 2020. JA324. Three days later, as a matter of customer service, the credit reporting department accepted the service request and removed the delinquency from the Ritzes' files. ECF No. 67-23, at 2. That same day, the department sent a notice instructing consumer reporting agencies to remove the information. JA238. NMAC did not, as the Ritzes suggest, waive the debt

45

but continue to report it as being due. Instead, after several months of back-and-forth, NMAC stopped reporting the debt as a courtesy to a customer.

## CONCLUSION

The District Court properly granted summary judgment to NMAC. This Court should affirm.

Dated: April 1, 2024

*/s/ Matthew A. Fitzgerald*
Matthew A. Fitzgerald
Virginia Bar No. 76725
Heidi E. Siegmund
MCGUIREWOODS LLP
800 East Canal St.
Richmond, VA 23219
(804) 775-4716
*mfitzgerald@mcguirewoods.com*
*hsiegmund@mcguirewoods.com*

Jarrod D. Shaw
MCGUIREWOODS LLP
260 Forbes Ave., Suite 1800
Pittsburgh, PA 15222
(412) 667-7907
*jshaw@mcguirewoods.com*

Grace Greene Simmons*
MCGUIREWOODS LLP
888 16th St. NW, Suite 500
Washington, DC 20006
(202) 828-2833
*gsimmons@mcguirewoods.com*

*\*Admitted in Pennsylvania. Application for admission to the DC bar filed. Working under the direct supervision of an enrolled, active member of the DC bar.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

- This brief contains 9,797 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because:

- This brief has been prepared in a proportionally spaced 14-point Georgia font using Microsoft Word.

The text of the electronic brief is identical to the text in the paper copies.

At least one of the attorneys whose names appear on this brief is a member of the bar of this Court.

The electronic version of this brief has been scanned for viruses using CrowdStrike Falcon Sensor, Version 7.04.17605.0, and no virus was detected.

*/s/ Matthew A. Fitzgerald*
Matthew A. Fitzgerald

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2024, the foregoing was filed with the Clerk of the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system, which will also serve counsel of record.

*/s/ Matthew A. Fitzgerald*
Matthew A. Fitzgerald