No. 23-2181

# In the United States Court of Appeals for the Third Circuit

MICHAEL RITZ and ANDREW RITZ,
*Plaintiffs-Appellants,*

v.

EQUIFAX INFORMATION SERVICES LLC, EXPERIAN INFORMATION SOLUTIONS INC., TRANSUNION LLC, and NISSAN INFINITI LT,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of New Jersey
Case No. 20-13509-GC-DEA (The Hon. Georgette Castner)

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

HANS LODGE
BERGER MONTAGUE PC
1229 Tyler Street, NE, Suite 205
Minneapolis, MN 55413
(612) 607-7794

JACOB M. POLAKOFF
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 875-3000

ROBERT D. FRIEDMAN
MATTHEW W.H. WESSLER
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*robert@guptawessler.com*

May 22, 2024                    *Counsel for Plaintiffs-Appellants*

# **TABLE OF CONTENTS**

Table of citations ...................................................................................ii

Introduction ...........................................................................................1

Argument ................................................................................................4

I.      NMAC's new standard has no basis in the FCRA's text or purposes.............4

II.     The Ritzes' disputes concern "objectively and readily verifiable"
        information................................................................................ 20

III.    A dispute over whether NMAC continued reporting after determining
        that the Ritzes owed no money also precludes summary judgment. ........... 25

Combined certifications .........................................................................1

i

# TABLE OF CITATIONS

## Cases

*Appalachian States Low-Level Radioactive Waste Commission v. Pena,*
126 F.3d 193 (3d Cir. 1997)................................................................16

*ATACS Corp. v. Trans World Communications, Inc.,*
155 F.3d 659 (3d Cir. 1998)..................................................................9

*Azar v. Allina Health Services,*
587 U.S. 566 (2019).............................................................................13

*Baker v. Gardner,*
770 P.2d 766 (Ariz. 1988)...................................................................17

*Cahlin v. General Motors Acceptance Corp.,*
936 F.2d 1151 (11th Cir. 1991)............................................................10

*Caraco Pharmaceuticals Laboratories, Ltd. v. Novo Nordisk A/S,*
566 U.S. 399 (2012)................................................................................6

*Chiang v. Verizon New England Inc.,*
595 F.3d 26 (2010)...............................................................................18

*Cunningham v. Trans Union, LLC,*
2023 WL 6823182 (S.D. Ohio Oct. 11, 2023).......................................8

*DeAndrade v. Trans Union LLC,*
523 F.3d 61 (1st Cir. 2008)..................................................................11

*Denan v. Trans Union LLC,*
959 F.3d 290 (7th Cir. 2020)...............................................................18

*Fasold v. Justice,*
409 F.3d 178 (3d Cir. 2005)................................................................24

*Gaines v. Monroe Calculating Machine Co.,*
188 A.2d 179 (N.J. 1963).....................................................................25

*Gray v. D & J Industries, Inc.,*
875 So. 2d 683 (Fla. Dist. Ct. App. 2004)............................................9

*Greene v. Citimortgage, Inc.*,
2009 WL 1506722 (E.D. Mich. May 27, 2009) ........................................................ 9

*Gross v. CitiMortgage, Inc.*,
33 F.4th 1246 (9th Cir. 2022) ........................................................................ 17

*Hinkle v. Midland Credit Management., Inc.*,
827 F.3d 1295 (11th Cir. 2016) .............................................................. 7, 14

*Holden v. Holiday Inn Club Vacations, Inc.*,
98 F.4th 1359 (11th Cir. 2024) ................................................................ 19

*Justice v. State Farm Insurance Co.*,
763 N.E.2d 186 (Ohio Ct. App. 2000) ..................................................... 10

*Kousmine v. Bostic*,
2008 WL 1901329 (N.J. Super. Ct. App. Div. 2008) ............................ 25

*Loughrin v. United States*,
573 U.S. 351 (2014) ................................................................................. 5, 12

*Mader v. Experian Information Solutions, Inc.*,
56 F.4th 264 (2d Cir. 2023) ........................................................................ 4

*McCarthy v. Azure*,
22 F.3d 351 (1st Cir. 1994) ......................................................................... 9

*Parker v. Montgomery County Correctional Facility/Business Office Manager*,
870 F.3d 144 (3d Cir. 2017) ...................................................................... 19

*Reyes v. Equifax Information Services, LLC*,
2023 WL 7272368 (E.D. Tex. Sept. 14, 2023) ...................................... 23

*Saunders v. Branch Banking and Trust Co. of Virginia*,
526 F.3d 142 (4th Cir. 2008) ..................................................................... 18

*Sessa v. Trans Union, LLC*,
74 F.4th 38 (2d Cir. 2023) ................................................................... 8, 20

*Smiley v. E.I. Dupont De Nemours & Co.*,
839 F.3d 325 (3d Cir. 2016) ...................................................................... 16

*State ex rel. Nixon v. Boone*,
 927 S.W.2d 892 (Mo. Ct. App. 1996) .......................................................10

*Uherek v. Sathe*,
 917 A.2d 306 (N.J. Super. Ct. App. Div. 2007) .........................................9

*United States v. McCord*,
 695 F.2d 823 (5th Cir. 1983) ......................................................................9

*United States v. Talebnejad*,
 460 F.3d 563 (4th Cir. 2006) ......................................................................9

## Statutes

15 U.S.C. § 1681............................................................................................15

15 U.S.C. § 1681i ................................................................................. *passim*

15 U.S.C. § 1681s-2................................................................................1, 5, 7, 18

49 U.S.C. § 32705 ....................................................................................... 23

## Other Authorities

141 Cong. Rec. S5449 (daily ed. Apr. 6, 1995) ............................................ 12

C.J.S. Contracts § 709................................................................................. 25

Pub. L. No. 91-508 § 611, 84 Stat. 1114 (1970)................................................ 12

Random House Unabridged Dictionary (2d ed. 1993) ................................. 7

S. Rep. No. 103-209 (1993) ........................................................................ 15

## Regulations

49 C.F.R. § 580.7............................................................................................ 23

# INTRODUCTION

At NMAC's urging, the district court held that consumers cannot bring an FCRA claim when they contest the accuracy of their credit reports based on a "legal dispute" rather than a "factual" one. NMAC, however, doesn't defend the holding it sought. Instead, it advances a new theory: that "accuracy" refers to information that is "objectively and readily verifiable," a definition that NMAC says encompasses "straightforward" legal disputes but no others. A consumer who disputes information in a credit report that doesn't clear this newly invented hurdle, NMAC contends, isn't even entitled to an investigation by the furnisher, let alone corrective action.

NMAC's newfound interpretation is just as flawed as its original. The simplest reason why is that it reads language out of the FCRA. Congress told furnishers what to do when disputed information "cannot be verified," that is, when information is "unverifiable": delete it. 15 U.S.C. § 1681s-2(b)(1)(E). That ensures, consistent with the FCRA's purpose, that consumers aren't damaged by reporting that the furnisher lacks a sufficient basis to conclude is true. By substituting the concept of "verification" for "accuracy," NMAC reads this express duty imposed on furnishers, a key protection for consumers, out of the statute.

NMAC's main rationale for its atextual interpretation—that faithfully adhering to the statute's text would make it too difficult for furnishers to meet the FCRA's 30-day investigation deadline—also rests on a flawed premise. The duty to

investigate disputes over "accuracy" existed in the statute for 26 years *before* Congress added the 30-day deadline. That deadline, therefore, cannot cabin the meaning of accuracy. Plus, the FCRA already protects furnishers from any deadline-related difficulties they might encounter when performing investigations by only imposing liability for failing to conduct *reasonable* investigations. Because NMAC's proposed interpretation stands at odds with the FCRA's text, history, and purposes, this Court should reject it.

Even under NMAC's preferred standard, reversal is still warranted for three independent reasons. *First*, the proper reading of NMAC's contract—which shows that NMAC had no right to assess an additional monthly payment to the Ritzes—is so "straightforward" that it satisfies NMAC's new interpretation. In arguing otherwise, the company advances an implausible interpretation of its lease, pointing to an appointment requirement that does not apply to returning vehicles and to a federal regulation that has nothing to do with a lessee relinquishing possession. NMAC's reporting is, therefore, "objectively and readily verifiable" as wrong.

*Second*, even accepting NMAC's implausible contract interpretation, the record evidence still demonstrates that NMAC reported incorrectly. Abandoning the justification it advanced below for its reporting (that the Ritzes had an automatic duty to schedule a return appointment), NMAC now contends that the Ritzes failed to comply with a duty to schedule a return appointment once NMAC provided

notice. Yet despite asserting three times that it gave the Ritzes notice "two months" in advance, NMAC offers zero evidence that it did so. NMAC has thus failed to show, even under its contract interpretation, how the facts support the accuracy of its reporting. At summary judgment, that was NMAC's burden.

*Finally*, NMAC's newly proposed standard aside, there's a routine factual dispute about whether NMAC continued to report that the Ritzes owed money after determining they didn't. NMAC asserts that it maintained that its reporting was accurate and merely waived the Ritzes' debt as a "courtesy." Yet it ignores entirely testimony from two employees and its unambiguous representation to the CFPB stating the opposite. That, too, creates a genuine issue of fact for a jury.

NMAC's counternarrative also exposes a fundamental inconsistency in its position. Although NMAC now claims that the disputed information was not verifiable, NMAC repeatedly told credit-reporting agencies that it had verified it in response to the Ritzes' disputes so that the information remained on the Ritzes' reports—and continued to harm them. Whatever impact NMAC's new standard may have in other cases, it doesn't bar the Ritzes' claims.

This Court should reverse.

**ARGUMENT**

## I. NMAC's new standard has no basis in the FCRA's text or purposes.

NMAC acknowledges (at 17) that the plain meaning of "accuracy" is "freedom from mistake or error." That concession is incompatible with the judgment below. As we explained in our opening brief (at 28–29), the term's broad scope draws no distinction between inaccurate credit reporting grounded in "factual" errors and those grounded in "legal" ones—the sole basis for the district court's decision. NMAC doesn't dispute this.

Instead, NMAC asserts (at 16–17) that the Court's "focus" should be not on the plain meaning of "accuracy" but on what it "refers to," which, in NMAC's view, is "objectively and readily verifiable information." For more than a decade, no court confronting furnishers' and credit-reporting agencies' arguments that "legal" inaccuracies cannot give rise to a claim under the FCRA suggested this interpretation. Nor did NMAC below. In front of the district court, it argued only that "accuracy" in the FCRA meant "factual accuracy"—a standard the company now abandons.

NMAC's new interpretation is no more faithful to the statute. The company borrows it from *Mader v. Experian Information Solutions, Inc.*, 56 F.4th 264 (2d Cir. 2023), but the Second Circuit plucked that phrasing out of thin air—no party argued for it, the court cited no authority for it, and the court made no attempt to explain how it

squares with the statutory text.[1] Although NMAC now attempts to fill those gaps, it fails. No less than the legal-factual distinction the district court adopted, NMAC's new interpretation lacks any basis in the FCRA's text, structure, history, or purpose. And it's at odds with the federal government's interpretation and the majority of the appellate case law, too.

**The text.** It is a "cardinal principle" of statutory interpretation that courts "must give effect, if possible, to every clause and word of a statute." *Loughrin v. United States*, 573 U.S. 351, 358 (2014). Thus, an interpretation that renders terms "superfluous" will be rejected. *Id.*

NMAC's late-breaking interpretation of "accuracy" cannot survive this basic rule. The statute directs that, once a consumer raises a dispute, the furnisher (or credit-reporting agency) must delete the at-issue information if it is "inaccurate *or* incomplete *or* cannot be verified." 15 U.S.C. § 1681s-2(b)(1)(E) (emphasis added); *see also* 15 U.S.C. § 1681i(a)(5)(A). By doing so, the FCRA expressly contemplates that information can be "accurate" or "inaccurate" but nonetheless "cannot be verified." And, of course, "cannot be verified" is another way of saying "unverifiable." Thus, the FCRA imposes a specific duty when information is "unverifiable": delete it.

---

[1] Unless otherwise specified, internal quotation marks, citations, emphases, brackets, and alterations are omitted from quotations throughout the brief.

NMAC's interpretation, however, effectively erases the duty to delete information that "cannot be verified." In NMAC's view, when disputed information is "unverifiable" (or even "verifiable," but just not "readily" so), the consumer has no right to even an investigation, let alone the statutorily mandated obligation that the furnisher delete the information. This Court should reject NMAC's bid to read these terms "out of the statute." *See Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 420 (2012). And it needs to go no further to reverse.

**2.** Even setting aside this fundamental conflict, NMAC's interpretation disregards the statute's text in other ways.

**a.** Start with the lynchpin of NMAC's new standard: "verifiable." According to NMAC (at 17), this can be used synonymously with accuracy because "verif[y]" is the "verb" that "Congress chose to describe how furnishers are supposed to confirm accuracy." Building from this premise, NMAC defines "verify" as "[t]o prove to be true; to confirm or establish the truth or truthfulness of; to authenticate." And, the company posits (at 18), because a furnisher "cannot verify the 'unsettled meaning' of a case, statute, or contract," and because "legal disputes are not naturally" referred to as being "verifiable," inaccuracies rooted in such disputes are beyond the scope of the FCRA.

No part of this is correct. Congress didn't use only the verb "verif[y]" to describe the furnisher's task. It directed furnishers to delete information "if an item

of information disputed by a consumer is *found* to be inaccurate or incomplete or cannot be verified after any reinvestigation." 15 U.S.C. § 1681s-2(b)(1)(E) (emphasis added). So even accepting NMAC's premise (at 18) that people don't "naturally" pair "verification" with legal disputes, people do commonly use the word "find" to describe their resolution. NMAC never explains why the definition of "accuracy" shouldn't be tied to "find" instead.

NMAC's definition of "verify" is also unduly narrow. As the Eleventh Circuit has explained, verification encompasses "the process of research, examination, etc., required to prove or establish authenticity or *validity*." *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1302 (11th Cir. 2016) (emphasis added) (quoting Random House Unabridged Dictionary 2113 (2d ed. 1993)). That definition maps on perfectly to what NMAC frames (at 15) as a dispute about the "validity of the Ritzes' debt."

And there's still a more basic problem with NMAC's argument: it's wrong about what furnishers verify. Take the Ritzes as an example. They never asked NMAC to verify "the 'unsettled meaning' of a . . . contract" because their credit reports don't say, "Mr. Ritz breached the return clause of his lease." The credit reporting looks instead like this:

| Account Status | Pay. Rate | MOP | Cond./Cumm. Status | Date Opened | Balance | Amount Past Due | High Cr./Org. | Credit Limit | Original Charge-Off Amount |
|---|---|---|---|---|---|---|---|---|---|
| 71 | | | | 05-10-2017 | $362 | $181 | $4356 | | |
| 11 | | | | 05-10-2017 | $430 | $0 | $4356 | $0 | |

JA218. So it's the "amount past due" column, asserting that the Ritzes failed to pay $181—a purely "factual" assertion—that's in dispute and that a furnisher must

attempt to "verify." The fit between "verify" and "unsettled" legal questions, then, is a non sequitur.

**b.** Next, consider NMAC's attempt to import the term "readily" into its interpretation. NMAC doesn't even try to ground this new adjective in the statute's text or the plain meaning of accuracy. Nor does NMAC explain what it means, other than that it is to some degree less harsh than the district court's rule and embraces sufficiently "settled" or "straightforward" legal disputes. *See also, e.g.*, *Sessa v. Trans Union, LLC*, 74 F.4th 38, 43 (2d Cir. 2023) (explaining that the standard allows some disputes that "turn on a question of law"); *Cunningham v. Trans Union, LLC*, 2023 WL 6823182, at *3 (S.D. Ohio Oct. 11, 2023) (same).

That's not all. NMAC also doesn't explain whether this new interpretation also excludes what courts had previously described as "factual" errors when they are not "readily" uncovered. And NMAC never addresses how its interpretation interacts with the "reasonable" investigation requirement: Can disputed information somehow be "readily" verifiable but yet not discoverable through a "reasonable" investigation or, as appears to be the case, is NMAC merely shifting reasonableness from jury to judge? Whatever the precise contours of "readily," it's not a part of the statute.

**3.** Finally, NMAC adds one more new term, "objectively," that likewise appears nowhere in the statute or the definition of accuracy. NMAC contends (at 17–

18) that only information that can be "objectively proven true or false" can be "accurate" under the FCRA. Even accepting this new addition changes nothing.[2]

To start, as NMAC is later forced to admit (at 24), credit reporting *can* be proven true or false even if the subject of a legal dispute. NMAC just wants it to happen in a declaratory judgment action. That's enough to sink the company's argument that certain reporting is incapable of being proven true or false.

NMAC is also wrong to claim that evaluating a contract or statute is a subjective exercise. It depends on "objective criteria," just like NMAC says (at 18, 38) is necessary. *See, e.g., ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 666 (3d Cir. 1998) (courts will sustain contract claims when there are "objective criteria to enforce"); *McCarthy v. Azure*, 22 F.3d 351, 358 (1st Cir. 1994) (endorsing view "that a court's role is to interpret contracts" as "measured by objective criteria"). And NMAC's only "proof" that legal disputes don't rely on "objective" criteria is its bald assertion (at 19) that courts "typically do[] not say that other readings [of contracts or statutes] are 'inaccurate.'" That's demonstrably untrue.[3]

---

[2] To be clear, the Ritzes are not advocating for any non-objective definition of accuracy. The term simply has no effect.

[3] S*ee, e.g.*, *United States v. Talebnejad*, 460 F.3d 563, 572 (4th Cir. 2006) ("This simply is not an accurate reading of the statute."); *Greene v. Citimortgage, Inc.*, 2009 WL 1506722, at *1 (E.D. Mich. May 27, 2009) (rejecting "[p]laintiff's inaccurate interpretations" of note); *United States v. McCord*, 695 F.2d 823, 827 (5th Cir. 1983); *Uherek v. Sathe*, 917 A.2d 306, 307 (N.J. Super. Ct. App. Div. 2007); *Gray v. D&J Indus., Inc.*, 875 So. 2d 683 (Fla. Dist. Ct. App. 2004); *Just. v. State Farm Ins. Co.*, 763 N.E.2d 186, 186

9

What's really underlying NMAC's argument is not "objectivity," but "certainty"—that furnishers may be less than 100% sure they are right when credit reporting is alleged to be inaccurate because of a "legal" error. But that concern applies equally to inaccurate reporting rooted in "factual" errors. Indeed, the only way an FCRA plaintiff can ever win is if that uncertainty results in an error and the plaintiff proves that reporting was inaccurate. But that inescapable uncertainty is why the FCRA, as NMAC recognizes (at 6), doesn't demand certainty or "perfection." It just demands a reasonable investigation.

Every aspect of NMAC's "objectively and readily verifiable" standard, then, is either unmoored from the statute's text or makes no difference here.

**The FCRA's structure and history**. NMAC's narrow interpretation is also at odds with the remainder of the FCRA.

**1.** As our opening brief explained, carving out "legal" inaccuracies—even if only some of them under NMAC's new interpretation—would render consumers like the Ritzes unable to take advantage of the statutory right to include their own description of a dispute in their credit reports. 15 U.S.C. § 1681i(b). NMAC acknowledges (at 24) the importance of this "unique remedy" that Congress crafted. *See Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 n.23 (11th Cir. 1991). It

---

(Ohio Ct. App. 2000); *State ex rel. Nixon v. Boone*, 927 S.W.2d 892, 897 (Mo. Ct. App. 1996).

nonetheless claims (at 24–25) that consumers will still be able to avail themselves of this statutory right because the fact that "a legal issue is not verifiable does not mean that it is not disputed."[4]

That assertion has no basis in the statute's text. Consumers only have a right to file their own statement about a dispute *if* "the reinvestigation" doesn't resolve it. 15 U.S.C. § 1681i(b). And "the reinvestigation," in turn, is triggered only when the "*accuracy* of any item of information contained in a consumer's file . . . is disputed by the consumer." *Id.* § 1681i(a)(1)(A) (emphasis added). So if disputing an "unsettled" legal issue doesn't put the report's "accuracy" in issue, as NMAC claims is the case, then there is no statutory "reinvestigation" to begin with and, it follows, no right to put in a consumer-authored statement. NMAC even champions this, repeatedly arguing (at 15, 16, 24) that it was "not required to investigate" the Ritzes' disputes at all. This Court should decline an interpretation of the FCRA that strips consumers of this important alternative remedy.[5]

---

[4] NMAC also suggests (at 24) that consumers could just obtain a declaratory judgment that the reporting is erroneous. But Congress deemed that preexisting remedy insufficient. It doesn't provide damages for harm already done. And consumers exposed to credit-reporting errors are often unable to pay for an attorney to prosecute them. That's why the FCRA provides for attorneys' fees.

[5] NMAC says *DeAndrade v. Trans Union LLC*, held otherwise, but it didn't analyze the text or even cite the relevant provision, § 1681i(b). 523 F.3d 61, 69 (1st Cir. 2008). It merely observed that a district court "noted" that consumers could still file their own statements even if "legal" inaccuracies aren't actionable. *Id.*

11

**2.** NMAC fares no better in attempting to justify (at 19–22) its interpretation of "accuracy" as necessary to coexist with the 30-day deadline to conduct reinvestigations. The argument "encounters a serious chronological problem." *Loughrin*, 573 U.S. at 359. The "accuracy" requirement has been a part of the FCRA since it was first enacted in 1970. At the time, reinvestigations only had to be conducted "within a reasonable period of time." Fair Credit Reporting Act, Pub. L. No. 91-508, § 611(a), 84 Stat. 1114, 1132 (1970). Thus, to the extent that certain disputes about "accuracy" demanded lengthy investigations, the statute allowed for it. The 30-day time limit was only added in 1996, and it was viewed as "the single most important consumer protection provision" to *bolster* the reinvestigation process. 141 Cong. Rec. S5449 (daily ed. Apr. 6, 1995) (comments of Sen. Bond and Sen. Bryan on S. 709). It didn't, instead, tacitly alter the plain meaning of "accuracy" to carve out an entire category of erroneous reporting.

**3.** NMAC's concern (at 20) that applying the plain meaning of "accuracy" would make it impossible for furnishers to rely on non-lawyers to handle credit disputes is also misplaced. That is properly addressed in the "reasonable investigation" element of a plaintiff's claim. It may well be that a "reasonable investigation" requires no more than a layperson evaluating the consumer's dispute. Indeed, lay people enter contracts daily. The Ritzes disputed their reports as laypeople. NMAC's head of complaints and supervisor in the Loss Recovery

12

Department—who both evaluated the Ritzes' dispute and concluded that NMAC had no right to assess another monthly payment—were lay people. *See* JA204, 274–76. And, if a consumer's dispute depends on unduly burdensome research to untangle a particularly "complex" dispute, as NMAC envisions (at 21) will come to pass, then the reasonableness prong will relieve the furnisher from engaging in that type of investigation. These are all questions, however, that should be resolved based on case-specific record evidence, not based on a categorical rule that throws out most (NMAC's new interpretation) or all (the district court's) inaccuracies rooted in legal error.

**4.** Faced with this clear statutory design, NMAC's response is to complain about it. The company predicts (at 34–35) that, because reasonableness may be left to a jury, it will somehow lead to consumers "coerc[ing]" settlements. Of course, there is a complete absence of evidence—from NMAC or any of the four amicus briefs filed on its behalf—of this being a problem in the circuits that have already endorsed the Ritzes' and CFPB's interpretation. But whatever the merits of NMAC's speculation, "courts aren't free to rewrite clear statutes under the banner of [their] own policy concerns." *Azar v. Allina Health Servs.*, 587 U.S. 566, 581 (2019).

NMAC also warns against (at 35) the possibility of requiring juries "to comb through a contract, statute, or caselaw to judge the reasonableness of an investigation." Yet it never explains why a jury would be asked to do that.

13

Determining whether an investigation is reasonable requires a jury to assess what a furnisher or credit-reporting agency should have done—for instance, examine a contract's terms or review a statute to which the consumer pointed—not to "comb" through those materials themselves.[6]

Finally, NMAC is simply incorrect in asserting (at 34) that the Ritzes have not discussed whether a furnisher must "be certain that it has the best reading" to satisfy its statutory obligations. We explained (at 43) that verifying disputed information "does not mandate 100 percent certainty"; rather, as the Eleventh Circuit has held, it merely requires "sufficient evidence to support the conclusion that the information was true." *Hinkle*, 827 F.3d at 1303. It's only when the furnisher cannot even clear that minimal hurdle that it must delete the information. And when that's the case, what good reason is there for wanting the furnisher to continue to report?

***The FCRA's purpose.*** NMAC all but admits that its reading of "accuracy" undercuts the FCRA's purpose. It acknowledges (at 26) that the FCRA aims to "promote fair and accurate credit reporting." *See also* 15 U.S.C. § 1681(a). It doesn't dispute that Congress sought to do this through mechanisms that are "fair and

---

[6] NMAC also worries (at 35) that trials "will inevitably become about the validity of the debt itself." But the meaning of contracts and statutes is ordinarily resolved before trial. And in the rare case that resort to a jury is necessary, that aspect of the trial would look just like the declaratory judgment action that NMAC says a consumer should pursue. NMAC never explains why that procedure is permissible in a declaratory judgment action but not in an FCRA case.

equitable" to consumers. *See* 15 U.S.C. § 1681(b). Nor does it contest, as we explained in our opening brief (at 33), that "legal" inaccuracies harm individuals in the exact same way as "factual" ones and wrongly deter lenders from doing business with consumers who are actually creditworthy. Nonetheless, borrowing from the legislative history, NMAC meekly offers that its interpretation is consistent with Congress's desire to "balance the needs of consumers and businesses." *See* S. Rep. No. 103-209, at 2 (1993).

There's no evidence, however, that Congress sought to achieve that balance through unnatural usage of the term "accuracy." The actual way that Congress accomplished this is, as we have explained, by limiting liability to when furnishers and credit-reporting agencies not only harm consumers through inaccurate reporting, but also fail to act reasonably. Indeed, the remainder of the sentence of legislative history on which NMAC relies says as much: it states that the FCRA "seeks to balance the needs of consumers and businesses *by requiring 'that consumer reporting agencies adopt reasonable procedures*.'" *See* S. Rep. No. 103-209, at 2 (1993) (emphasis added). And so does Congress's duly enacted declaration of purpose. *See* 15 U.S.C. § 1681(b).

Nor would NMAC's interpretation be an effective way for Congress to strike a balance. If, as NMAC says, furnishers are not required to investigate information that isn't "objectively and readily verifiable," how can a furnisher determine what's "readily" verifiable without first doing some investigation? NMAC never explains

15

why Congress, to relieve furnishers (and credit-reporting agencies) from the obligation to investigate, would nonetheless require them to investigate.

At bottom, it would simply make no sense for Congress, in its effort to enhance accuracy in credit reporting and enable consumers to protect themselves from damaging false information, to immunize furnishers and credit-reporting agencies from liability for false reporting even when they act unreasonably and an investigation wouldn't be burdensome. Yet that is exactly what NMAC asks this Court to hold.

***Administrative interpretation***. NMAC acknowledges (at 32–33) that the plain language of the regulations interpreting "accuracy" encompasses disputes grounded in legal errors. It just asserts that this will "usually" involve only "objectively and readily verifiable" information. Even assuming that's right, NMAC offers no textual basis to carve out the "unusual" case.

NMAC also urges this Court not to afford any deference to the CFPB's and FTC's views because they represent a "litigation position." But the case on which NMAC relies involved the government as a party, *see Appalachian States Low-Level Radioactive Waste Comm'n v. Pena*, 126 F.3d 193, 198 (3d Cir. 1997), not, as here, an amicus, *see, e.g., Smiley v. E.I. Dupont De Nemours & Co.*, 839 F.3d 325, 329 (3d Cir. 2016).

16

***The case law.*** Finally, NMAC asserts (at 26) that the courts of appeals "generally agree that furnishers and consumer reporting agencies are only required to investigate objectively and readily verifiable information." That's just not true.

**1.** The reality is that the majority of courts that have weighed in on "accuracy" in suits against furnishers have concluded that the FCRA treats "legal" inaccuracies the same as "factual" ones. Start with *Gross v. CitiMortgage, Inc.*, which held that the FCRA "will sometimes require furnishers to investigate, and even to highlight or resolve, questions of legal significance." 33 F.4th 1246, 1253 (9th Cir. 2022). NMAC's amicus acknowledges that *Gross* endorses the Ritzes' interpretation. *See* Chamber Br. at 20. NMAC, however, resists that conclusion, arguing (at 29) that "sometimes" means that not all legal disputes must be investigated. But "sometimes" there refers to when a "legal" (rather than "factual") error forms the basis of the consumer's dispute, not a subset of those disputes. That's why the Ninth Circuit adopted the position that the "Consumer Financial Protection Bureau emphasized in its amicus brief"—the same one it raises in this case. *Gross*, 33 F.4th at 1253.[7]

---

[7] NMAC also asserts (at 29) that *Gross* fits within its new interpretation because it involved "an Arizona statute that clearly and unambiguously abolished a homeowner's liability." That's not correct. The statute was sufficiently unclear that it went up to the Arizona Supreme Court and generated a dissent. *See Baker v. Gardner*, 770 P.2d 766 (Ariz. 1988); *Gross*, 33 F.4th at 1252. And, 35 years later, the district court in *Gross* still reviewed California law "[b]ecause caselaw interpreting Arizona's anti-deficiency statutes is slim." *Gross v. CitiMortgage Inc.*, 2020 WL 5976678, at *6 (D. Ariz. Oct. 8, 2020).

NMAC also falters in attempting to distinguish decisions from the Seventh and Fourth Circuit. In *Denan v. Trans Union LLC*, the Seventh Circuit explained that, under the FCRA, "furnishers are tasked with accurately reporting liability." 959 F.3d 290, 295 (2020). NMAC argues (at 30) that the Seventh Circuit never said that furnishers must therefore investigate "all" disputes, but that's the necessary consequence of the FCRA's design: If a furnisher must accurately report liability, then it must investigate when that reporting is disputed. *See* 15 U.S.C. § 1681s-2(b)(1). As for the Fourth Circuit's decision, NMAC claims (at 31) it is "not relevant" because the case arose in the context of a furnisher's failure to report that a debt was disputed. *See Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 150 (4th Cir. 2008). That's immaterial. The "relevance" of *Saunders* is that it held that a consumer who disputes credit reporting by raising an affirmative defense—a "legal dispute," in NMAC's view—still disputes "accuracy" and triggers the furnisher's duty to "review their prior report for accuracy and completeness" and, if necessary, amend its reporting. *Id.* at 149.

The two decisions that go in the other direction don't even apply the same rule. NMAC makes no effort to defend the terse reasoning in *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 38 (1st Cir. 2010), which applied the legal-factual distinction, not the "objectively and readily verifiable" standard.

The sole case against a furnisher that applied NMAC's interpretation is *Holden v. Holiday Inn Club Vacations, Inc.*, 98 F.4th 1359 (11th Cir. 2024). *Holden*, despite acknowledging that the issue "turns on the meaning of 'accuracy,'" made no attempt to square its interpretation with the FCRA's text. *Id.* at 1367. Instead, after observing that to prove inaccuracy, a plaintiff must establish that a report is "factually incorrect" or "objectively likely to mislead its intended user," the court simply adopted the "objectively and readily verifiable" interpretation based on nothing more than a "see also" citation to *Mader*. *Id.* at 1367–68.[8] And *Mader*, as described above, is no more thorough. The absence of any textual reasoning in *Mader* (which addressed a claim against a credit-reporting agency, not a furnisher) and *Holden* isn't a coincidence: It reflects the absence of any textual basis for NMAC's interpretation.

This Court does not follow its sister circuits when a "compelling basis exists." *Parker v. Montgomery Cnty. Corr. Facility/Bus. Off. Manager*, 870 F.3d 144, 152 (3d Cir. 2017). The Second and Eleventh Circuit's atextual approach, seemingly driven by "perceived unfairness[] rather than the language of" the statute, provides the requisite justification here. *See id.* at 151.

**2.** NMAC also points to other cases involving credit-reporting agencies, not furnishers. But those cases, as we explained (at 40–42), were based on flawed policy

---

[8] *Holden* also failed to explain why a report that says a consumer missed a payment not owed isn't "objectively likely to mislead" a reader.

rationales specific to credit-reporting agencies, not the text of the FCRA.

That does not mean, as NMAC asserts (at 28–29), that the Ritzes are advocating for this Court to give "accuracy" different meanings in different sections of the FCRA. This Court should not do so. It simply means that, even if this Court found the policy concerns raised in these other cases to be relevant and persuasive, that would not warrant importing them into the claims here.

## II. The Ritzes' disputes concern "objectively and readily verifiable" information.

Even assuming NMAC's newly proposed interpretation applies, summary judgment was still improper here. Under NMAC's interpretation, a dispute that "turn[s] on a question of law" will satisfy the "objectively and readily verifiable" test—and, thus, the FCRA's "accuracy" requirement—if it involves a "straightforward application of law to facts." *Sessa*, 74 F.4th at 43.

*Sessa* provides a useful illustration. There, the furnisher reported that the plaintiff owed a balloon payment (a lump sum owed at the end of a loan term) of $19,444 when her car lease expired. *Id.* at 40–41. The plain terms of the lease, however, stated that she had the option to purchase her car for that amount, not that she owed it as a balloon payment. *Id.* So, because there "simply was no balloon payment," the claim was sufficiently "straightforward" to be an "objectively and readily verifiable" inaccuracy. *Id.* at 43–44 & n.7.

The Ritzes' dispute satisfies this test in two ways: First, the lease terms here are so "straightforward" that NMAC's reporting is "objectively and readily verifiable" as wrong. Second, even if this Court accepts NMAC's flawed interpretation of its contract, NMAC has not presented any evidence of the conditions necessary to justify an additional monthly assessment.[9]

**1.** Start with the meaning of the lease. The "Vehicle Return" section of the lease provides that the Ritzes must "return the Vehicle to a Nissan dealer or other location we specify," but if the "Vehicle is not returned as required," then NMAC may continue to "charg[e] the Total Monthly Payment." JA51. It likewise provides that the Ritzes "will continue to pay the monthly payments" if they "keep possession of this Vehicle past the end of the lease term." JA51. In this way, the lease provides liquidated damages for specific violations: If a lessee returns the car to the wrong place or doesn't return it at all, NMAC will continue to charge monthly payments. Because the Ritzes did neither, NMAC had no right to assess another monthly payment.

The interpretive gymnastics NMAC offers to avoid this straightforward conclusion is baseless or, as NMAC may put it, "objectively and readily verifiable"

---

[9] Given that NMAC repeatedly "verified" the at-issue information when credit-reporting agencies forwarded the Ritzes' disputes, *see See* Op. Br. at 15–16, it's difficult to understand how NMAC can now claim it wasn't "objectively and readily verifiable."

as wrong. First, NMAC asserts (at 39–40) that the Ritzes failed to make an appointment to return their car. But just as there "simply was no balloon payment" in *Sessa*, there simply is no appointment requirement for returning the vehicle in the "Vehicle Return" section. JA51.

Because that's plain from the face of the contract, NMAC leans on a separate requirement from an entirely separate part of the lease. It looks to the section on "Excessive Wear and Use," which requires the lessee to appear at an appointment (1) at a "time and place to be designated by us," i.e., by NMAC (not the other way around), (2) "*prior* to the scheduled termination," (3) to inspect for "excessive wear and use," not to terminate the lease. JA51–52. NMAC offers no basis to read this requirement for a pre-termination, at-NMAC's-discretion, and NMAC-scheduled appointment for a wear-and-use inspection as a requirement that the Ritzes call to set up their own appointment to schedule *a return*.

Second, NMAC argues (at 42) that it had a right to continue to assess monthly payments because the Ritzes didn't sign a mileage statement. The Vehicle Return section doesn't say, however, that failure to sign the mileage statement triggers the liquidated damages of monthly payments. JA51.

Tacitly admitting this, NMAC attempts to incorporate the requirement to complete a mileage statement into the concept of "possession." It argues (at 42) that a federal regulation precludes a lessee from relinquishing possession without signing

a mileage statement and the Ritzes, therefore, "kept constructive possession of the car."

But the regulation on which NMAC relies says nothing of the sort. It merely requires a lessee to provide a mileage statement "in connection with the transfer of *ownership*." 49 C.F.R. § 580.7(b) (emphasis added). Same with the statute this regulation implements: It imposes a duty to prove mileage disclosure statements "when the *lessor* transfers *ownership*." 49 U.S.C. § 32705(c) (emphasis added). Neither says anything about the mileage statement serving as a federally mandated condition precedent to the routine transfer of *possession* by a *lessee* when a lease ends.[10] NMAC's interpretation is thus just as unfounded as the one in *Sessa*.

NMAC's convoluted interpretation of the contract also exemplifies why the CFPB has warned that distinguishing between "factual" and "legal" accuracies, as the district court did, or applying the "objectively and readily verifiable" standard, as NMAC urges, leads to abuses. CFPB Amicus Br. at 12*; see also, e.g.*, *Reyes v. Equifax Info. Servs., LLC*, 2023 WL 7272368, at *5 (E.D. Tex. Sept. 14, 2023) (characterizing dispute over whether credit card charges were fraudulent as a "legal" one that failed under "objectively and readily verifiable" standard). NMAC has done nothing more than manufacture an atextual, for-litigation-only interpretation of its contract that it

---

[10] That's not to say that the lack of a mileage statement couldn't complicate a later-in-time attempt to sell the used vehicle. But the contract has a general default clause, which requires proof of actual damages, for that type of breach. JA52.

claims—and the district court accepted—immunizes it from the harm that its false reporting inflicted on the Ritzes.

**2.** At any rate, NMAC had no right to assess an extra monthly charge even under its own interpretation of the lease. Below, NMAC argued that the Ritzes had an automatic duty to schedule an appointment. *See* Doc. 66-5 at 1, 4, 5, 13. Perhaps recognizing the absence of support in the lease for that claim, NMAC shifts gears. Doing its best to utilize the wear-and-use appointment language, NMAC argues (at 36) that the contract imposed on the Ritzes a duty to schedule an appointment "[u]pon notice from us." To prove compliance with this interpretation, NMAC repeats three times that it gave the required notice "two months" in advance of the end of the lease term. And NMAC asserts that the Ritzes' failure to comply with that conditional contract requirement justified NMAC refusing to allow the Ritzes to return their car when they showed up, refusing to allow them to sign the mileage statement, and then assessing an extra monthly payment.

NMAC, however, has identified no evidence to support its claim that it provided notice, let alone "two months" in advance—and at summary judgment, it was NMAC's burden to come forward with undisputed evidence in its favor. *See, e.g.*, *Fasold v. Just.*, 409 F.3d 178, 180, 183 (3d Cir. 2005). Twice (at 8, 40), NMAC cites only a website page that Andrew Ritz printed on December 30, 2019—four months *after* the Ritzes returned the car. *See* JA59; *see also* JA71. The third time (at 41), NMAC cites

24

nothing at all. Nonetheless, NMAC refused to deal with the Ritzes when they appeared to return their car.

That's little different than if NMAC had torn up a check the Ritzes mailed in, but then reported they had missed a payment and charged a late fee. So even if this Court assumes that the law is what NMAC says and accepts its contract interpretation, a "straightforward" application of that law to the record evidence still leaves NMAC's reporting inaccurate.[11] Summary judgment was improper for this reason, too.

## III.   A dispute over whether NMAC continued reporting after determining that the Ritzes owed no money also precludes summary judgment.

There is another reason, distinct from any inquiry under the objectively and readily verifiable standard, that summary judgment was improper: NMAC continued to report the Ritzes as late on a monthly payment after determining that they didn't actually owe the money. NMAC does not dispute that, if true, this would

---

[11] The "objectively and readily verifiable" absence of a right for NMAC to assess a monthly payment is also reflected in the common-sense principle and black-letter rule of law that "[a] party to a contract who has caused a failure of performance by the other party cannot take advantage of that failure." C.J.S. Contracts § 709 (collecting cases); *Kousmine v. Bostic*, 2008 WL 1901329, at *2 (N.J. Super. Ct. App. Div. 2008) ("Plaintiff sued for breach of contract yet her conduct of banning defendant from the job site rendered him unable to complete the contract. One who prevents a thing from being done may not avail himself of the non-performance which he himself has occasioned."); *Gaines v. Monroe Calculating Mach. Co.*, 188 A.2d 179, 185–86 (N.J. 1963) (similar).

present an actionable inaccuracy. Instead, NMAC insists that it never made that determination and, instead, waived the debt as a matter of customer service.

The Ritzes have raised a genuine issue of fact about whether NMAC's narrative is true. NMAC's argument rests on its claim (at 43, 46) that it removed the debt "as a courtesy," but "never decided that its reporting was inaccurate." NMAC's employees, however, testified to the exact opposite. The head of complaints, Tanya Messmer, explained that she removed the Ritzes' debt because of a "mistake made by the dealer" and was "not making an exception for a mistake made by the Ritzes." JA204. Her colleague—not in "customer service" but in the Loss Recovery Department—testified to the same, agreeing that NMAC "stopped reporting that late payment because it turned out to be true that the Ritzes returned the car on August 9th." JA274–76. And NMAC told the CFPB that the Ritzes' "vehicle was returned on August 9, 2019," and the dealer was "late in grounding the vehicle," JA251, not that NMAC decided to waive the debt as a "courtesy." NMAC has no response to this evidence.

What little NMAC does say is irrelevant. NMAC stresses (at 45) that its credit-reporting department, not customer service, was responsible for credit reporting. That's the problem: Even though customer service had concluded that the money wasn't owed, the credit team reported it anyway. To the extent that NMAC means to say that the credit department's determination controlled whether NMAC, as an

entity, considered the debt owed, record evidence, again, shows that the authority to make that determination lay elsewhere. Ms. Messmer testified, "I overrode CBM's [the credit department's] decision." JA206; *see also* JA196. A jury could credit this testimony, especially given NMAC's representation to the CFPB. Summary judgment was, therefore, improper.

## CONCLUSION

This Court should reverse.

Respectfully submitted,

*/s/ Robert D. Friedman*
ROBERT D. FRIEDMAN
MATTHEW W.H. WESSLER
GUPTA WESSLER LLP
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*robert@guptawessler.com*

HANS LODGE
BERGER MONTAGUE PC
1229 Tyler Street, NE, Suite 205
Minneapolis, MN 55413
(612) 607-7794

JACOB M. POLAKOFF
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 875-3000

May 22, 2024                    *Counsel for Plaintiffs-Appellants*

## COMBINED CERTIFICATIONS

1. This brief complies with Local Rule 46.1(e) because Robert D. Friedman, counsel for the appellants, is a member of the bar of this court.

2. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 6,481 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

3. I certify that on May 22, 2024, I filed this reply brief electronically via this Court's CM/ECF system. All participants in this appeal are registered CM/ECF users and will be served by the CM/ECF system.

4. The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

5. This document was scanned for viruses using VirusTotal API version 3 and no virus was detected.

May 22, 2024

/s/ Robert D. Friedman
Robert D. Friedman